*86 CANTIL-SAKAUYE, C. J.,
Concurring and Dissenting. This case was a classic gang crime. It was a confrontation between two Sacramento Norteños and a Sacramento Sureño in a shopping plaza parking lot in an area claimed by the Norteños, which escalated from the exchange of Norteños and Sureños gang slurs into a shooting that seriously injured multiple individuals, including an innocent young child. Surely, this is the very type of gang crime at which the STEP (California Street Terrorism Enforcement and Prevention) Act was aimed. (Pen. Code, § 186.21 ;[1] People v. Rodriguez (2012) 55 Cal.4th 1125, 1129 [150 Cal.Rptr.3d 533, 290 P.3d 1143]; People v. Albillar (2010) 51 Cal.4th 47, 55 [119 Cal.Rptr.3d 415, 244 P.3d 1062].) Not surprisingly, the jury found defendant committed the underlying crimes “for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members.” (§ 186.22, subd. (b)(1).)
When a reviewing court considers a claim that the evidence is insufficient to support a verdict, it considers the entire record in the light most favorable to the prosecution and presumes in support of the verdict the existence of every fact the jury could reasonably have deduced from the evidence. (People v. McCurdy (2014) 59 Cal.4th 1063, 1104 [176 Cal.Rptr.3d 103, 331 P.3d 265].) Applying this standard here, I disagree with my colleagues who conclude that there is insufficient evidence in the record to support the jury’s true finding on the gang enhancement. The circumstances of the crime and the unchallenged testimony of the prosecution’s expert, Detective John Sample, sufficiently established the necessary links between defendant, Entibo Chacon, the predicate crime gang members and the Sacramento Norteños.
Evidence was admitted at trial in this case that defendant identified himself, in an interview with law enforcement, as a “Norte” or a “Northerner” who “claimed” the Detroit Boulevard neighborhood of Sacramento as his “set.” He told officers that he started claiming the Northerners when he was in seventh grade after some gang-related trouble in school. He explained that he claimed Norte because all of his family, on his maternal side, were Northerners. Prior to the events of November 26, 2010, defendant had been involved in a number of confrontations with Sacramento Sureños gang members, including one incident involving an exchange of gunfire with individuals wearing clothing associated with the Sureños. Defendant possessed Norteño graffiti, images, clothing, and other paraphernalia consistent with Norteño gang membership, some relating to the Varrio Diamonds neighborhood set of the Norteños.
*87 On the evening of November 26, 2010, defendant was in the company of Emilio Chacon. Chacon was a Sacramento Norteño with the Varrio Franklin Boulevard subset. Chacon’s body was tattooed with symbols and the number 14, associated with the Norteños. Defendant and Chacon had traveled from their own southern area of Sacramento to an area near a Panda Express restaurant in midtown Sacramento intending to go into the nearby Safeway store to steal a bottle of brandy. The neighborhood they were in was territory claimed by the Varrio Centro Norteños and the Southside Park Norteños. Defendant was wearing clothing in the red color typically associated with the Norteños.
In the parking lot, defendant and Chacon encountered and confronted Gustavo Manzo, who was wearing attire typically associated with the Sureños and who was in fact a validated Sureños gang member. Both defendant and Chacon called out terms and phrases such as “Norte,” “Northerner,” “this is Norte,” “fuck a Skrap, 916 [Sacramento’s regional telephone area code],” and “fucking Skrap, 916.” Defendant did not yell “Detroit Boulevard” or any variant and Chacon did not yell “Varrio Franklin Boulevard” or any variant. They both claimed the Norteños gang that connected them together, challenging a perceived Sureño who was in territory claimed by the Sacramento Norteños. In response, Manzo and his girlfriend called defendant and Chacon “Busters,” a general derogatory term for Norteños used by Sureños. The confrontation escalated with defendant throwing gang signs and exchanging with Manzo further derogatory gang slurs. It culminated in defendant drawing a gun and shooting Manzo and Manzo’s girlfriend’s 10-year-old brother.
Under these circumstances, the prosecution reasonably sought to prove the existence of a Sacramento Norteños criminal street gang and that defendant’s crimes were committed for the benefit of that gang.
I agree with Justice Corrigan that the specific and narrow issue presented in this case is what evidence is necessary to prove a criminal street gang enhancement when the prosecution proffers evidence that a defendant committed a felony to benefit a street gang that operates through subsets, but the predicate offenses are committed by members of a subset of such gang. (Cone. & dis. opn. of Corrigan, J., post, at p. 91.) I disagree, however, that the evidence admitted in this case, notably unchallenged by the defense at trial, was insufficient.
For the purpose of proving the existence of a Sacramento Norteños criminal street gang, the prosecution called Sacramento Police Department Detective John Sample as its expert witness on Hispanic gangs. After Sample testified to his extensive training, experience and previous testimony as an *88 expert witness on Hispanic street gangs and gang culture, the defense declined voir dire and the trial court accepted him as a qualified expert witness on the subject.
Sample testified that “the Norteños” are “a Hispanic street gang active in Sacramento and throughout California” with approximately 1,500 local members in Sacramento. (Italics added.) Sample testified that the Sacramento Norteños do not have a general “turf.” Rather, the members are “all over Sacramento, from north and south.” He explained, however, that there are “subsets based on different neighborhoods,” which the members will “claim.” Asked to give the jury an idea of their common identifying names, signs or symbols, Sample testified that because Norteño was Spanish for north, the Norteños use “derivatives of the north, Norteños, northerner.” They also use the letter N. And because N is the 14th letter of the alphabet, they also use the number 14 or derivatives of it such as one and four dots or the Roman numeral XIV. According to Sample, the color typically associated with Norteños is the color red. The primary enemies of the Norteños are Sureños gang members. Sample testified that the Sureños are “a street gang just like the Norteños.” (Italics added.) They identify themselves with the color blue, the letters S and M, and the number 13 with its derivatives. Sample described the “primary activities” of the Sacramento Norteños as unlawful homicide, attempted murder, assault, firearms offenses, and weapons violations.
The prosecution then asked Sample if he would agree that the Norteños in the Sacramento area engage in a pattern of criminal activity. He responded, “Yes.” (Italics added.) Asked to give a couple of examples of “that criminal activity” (italics added), i.e., the predicate crimes of the Sacramento Norteños, Sample described his investigation of a homicide that occurred on August 19, 2007, in which Varrio Gardenland Norteños “subset” gang members shot three gang members from the Del Paso Heights Norteños “subset,” killing one of them. Sample agreed that the incident was an example of “in-house” “Norteño on Norteño” crime. Sample also described a 2010 incident in which several members of the Varrio Centro Norteños “subset” (in whose territory defendant’s crimes occurred) shot at a “drop-out Norteño gang member.” Sample’s expert testimony, given in response to the question of whether “the Norteños in the Sacramento area” engage in a pattern of criminal activity, implicitly, but clearly, linked the Varrio Garden-land Norteños subset and the Varrio Centro Norteños subset involved in the described predicate crime incidents to the Sacramento Norteños. His testimony expressed his opinion that the predicate crimes were committed by and on behalf of the Sacramento Norteños. Implicitly, the testimony also expressed his opinion that the predicate crime subsets considered themselves to be and acted as part of the Sacramento Norteños.
*89 Sample went on to describe how a shooting such as the one in this case would be intended to benefit the Norteños by enhancing their reputation for violence and ruthlessness.
Sample was asked, during cross-exantination, to explain the genesis of the north/south rivalry between the Norteños and Sureños gangs. In response, Sample testified that the two groups evolved from prison gangs active from at least the 1960s and 1970s. According to Sample, the Mexican Mafia was one of the strongest prison gangs. It would often victimize Latino inmates who were not part of the gang culture. Eventually, Latino inmates who were not part of the Mexican Mafia formed their own prison gang which they called the Nuestra Familia, which means “our family” in Spanish. Sample testified that the prison rivalry eventually “poured out into the streets.” Outside prison, those who identified with Nuestra Familia called themselves Norteños and those who identified with the Mexican Mafia called themselves Sureños.
Viewing this record, as we must, in the light most favorable to the judgment (People v. McCurdy, supra, 59 Cal.4th at p. 1104; People v. Rountree (2013) 56 Cal.4th 823, 852-853 [157 Cal.Rptr.3d 1, 301 P.3d 150]), there is evidence that is reasonable, credible, and of solid value from which a rational trier of fact could find that the Sacramento Norteños is a criminal street gang. Indeed, the very case the majority cites for the deferential standard of review when evaluating the sufficiency of evidence (maj. opn., ante, at p. 71, citing People v. Zamudio (2008) 43 Cal.4th 327 [75 Cal.Rptr.3d 289, 181 P.3d 105]) reminds us that “[a] reversal for insufficient evidence ‘is unwarranted unless it appears “that upon no hypothesis whatever is there sufficient substantial evidence to support” ’ the jury’s verdict.” (Zamudio, at p. 357.) “ ‘We do not reweigh evidence or reevaluate a witness’s credibility.’ ”(People v. Scott (2011) 52 Cal.4th 452, 487 [129 Cal.Rptr.3d 91, 257 P.3d 703].) “ ‘Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.’ ” (People v. Brown (2014) 59 Cal.4th 86, 106 [172 Cal.Rptr.3d 576, 326 P.3d 188].) “Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact.” (Evid. Code, § 805.) A witness testifying in the form of an opinion may state on direct examination the basis for his or her opinion and a court may in its discretion require that such a witness be examined before testifying regarding “the reasons for his opinion and the matter . . . upon which it is based” (Evid. Code, § 802), but any inadmissible material that forms the basis of the opinion testimony is not “ ‘independent proof’ of any fact.” (People v. Gardeley (1996) 14 Cal.4th 605, 619 [59 Cal.Rptr.2d 356, 927 P.2d 713].) Correspondingly, the failure to testify to such basis is not a failure of “proof.” Under these principles, Detective Sample’s expert testimony, taken *90 as a whole and in context, when viewed in conjunction with the evidence of the circumstances of the crime, including the collaboration of defendant and Chacon in traveling to another Norteños area of Sacramento, indeed the territory of one of the predicate crime subsets, with the criminal purpose of shoplifting and then mutually confronting Manzo with Norteños taunts in an apparent attempt to protect Norteños turf, is sufficient to support the jury’s verdict finding true the gang enhancement under section 186.22, subdivision (b).
The majority cites People v. Lawley (2002) 27 Cal.4th 102 [115 Cal.Rptr.2d 614, 38 P.3d 461] in support of its conclusion that Sample’s characterization of the Sacramento Norteños as a criminal street gang, without a description of further facts or reasoning, is of no value and constitutes insufficient evidence of that fact. (Maj. opn., ante, at p. 85.) Lawley is not on point. In Lawley, this court rejected the defendant’s contention that the trial court was required to appoint a third competency expert when two previously appointed experts came to opposite conclusions. (27 Cal.4th at pp. 131-132.) We found appointment of a third expert in such situation unnecessary, noting that the trial court was able to assess the weight and persuasiveness of the experts’ findings and conclusions without resort to further expert opinion. In that context, we noted the chief value of an expert’s testimony lies in the material and reasoning on which his or her opinion rests, and observed that expert opinion evidence is really an argument to the court. (Id., at p. 132.) Lawley does not stand for the proposition that expert opinion evidence must be rejected absent a full explanation of the facts and reasoning on which it is based, i.e., that it cannot itself constitute substantial evidence. Rather, it is up to the trier of fact to give it the weight that it deserves. (People v. Brown (2014) 59 Cal.4th 86, 100-101 [172 Cal.Rptr.3d 576, 326 P.3d 188]; see People v. Jones (2012) 54 Cal.4th 1, 59 [140 Cal.Rptr.3d 383, 275 P.3d 496].) Jennings v. Palomar Pomerado Health Systems, Inc. (2003) 114 Cal.App.4th 1108, 1117-1118 [8 Cal.Rptr.3d 363], cited by the majority (maj. opn., ante, at pp. 84-85), is also distinguishable. In Jennings, the trial court granted the defendants’ motion to strike an expert witness’s testimony regarding causation as being without foundation and the issue before the reviewing court was whether the trial court erred in concluding the testimony was inadmissible. (Jennings, at p. 1112.) The issue is different when an expert’s relevant and qualified testimony is admitted without objection or challenge, as was the case with Sample’s opinion testimony. Under the circumstances here, it is inconsistent with the applicable standard of review for a reviewing court, in the absence of patent falsity, inherent improbability, or other reason to question its validity, to decide that Sample’s testimony is incredible or without value.
*91 For the same reason, Sample’s testimony implicitly establishing that the subset gang members who committed the predicate crimes considered themselves to be part of the Sacramento Norteños may not be rejected on appeal. Sample’s testimony was not unreasonable, incredible, or lacking in solid value simply because it expressed his expert opinion that the predicate crime gang “subsets” acted as part of the Sacramento Norteños. (Evid. Code, § 805.) Indeed, there is nothing in the record before us that suggests Sample’s opinion lacked a sound basis given his broad experience and personal knowledge of Hispanic gangs in the Sacramento area, including the predicate offense Sacramento Norteños subsets.
It is well settled that proof may be by both direct and circumstantial evidence. (People v. Jones (2013) 57 Cal.4th 899, 961 [161 Cal.Rptr.3d 295, 306 P.3d 1136] [circumstantial evidence may be sufficient to prove guilt beyond a reasonable doubt]; People v. Morrow (1882) 60 Cal. 142, 144-145 [circumstantial evidence may be as strong as direct evidence in proving guilt]; see People v. Livingston (2012) 53 Cal.4th 1145, 1167 [140 Cal.Rptr.3d 139, 274 P.3d 1132] [the law regarding proof by direct and circumstantial evidence is correctly stated in CALCRIM No. 223 & CALJIC No. 2.00].) Here there was such evidence supporting a reasonable inference that the predicate crime gang subsets were part of the Sacramento Norteños and that the Sacramento Norteños is a criminal street gang. The courts in People v. Ortega (2006) 145 Cal.App.4th 1344 [52 Cal.Rptr.3d 535] and In re Jose P. (2003) 106 Cal.App.4th 458 [130 Cal.Rptr.2d 810] upheld jury verdicts finding the Norteños to be a criminal street gang. We should do the same.
Chin, J., concurred.

 All further statutory references are to the Penal Code unless otherwise indicated.