Filed 5/7/21  Spinner v. Felser CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ROBERT SPINNER et al.,<br><br>　　　Plaintiffs and Appellants,<br><br>v.<br><br>JOSHUA FELSER,<br><br>　　　Defendant and Respondent. | A157623<br><br>(Marin County<br>Super. Ct. No. CIV1702644) |

Plaintiffs Robert Spinner and his wife Leslie LaRhette appeal a judgment apportioning liability and awarding damages for injuries arising out of a car accident involving Spinner and defendant Joshua Felser. At trial, Felser conceded fault but presented evidence that Spinner's excessive speed contributed to the accident. The jury found Felser 55 percent at fault and apportioned 45 percent of the fault for the accident to Spinner. On appeal, plaintiffs contend the court erred in admitting testimony by Felser's accident reconstruction expert. They argue the expert's testimony should have been excluded as speculative and lacking in foundation and that the evidence, even if admissible, was insufficient to support the jury's contributary negligence finding. Plaintiffs also contend the court erred in allowing Felser's counsel to use "flip charts" prepared by the expert as demonstrative aids in closing argument. We find no error and affirm the judgment.

1

## Background

Plaintiffs' complaint alleges a cause of action for negligence by Spinner and a cause of action for loss of consortium by LaRhette.

At trial, evidence was presented that Spinner and Felser were involved in a collision at the intersection of Civic Center Drive and Peter Behr Drive in San Rafael. It was undisputed that at the time of the accident entry into the intersection from Peter Behr was controlled by a stop sign, while entry into the intersection on Civic Center Drive was uncontrolled. The speed limit on Civic Center Drive was 25 miles per hour at the time of the accident.

Felser testified that at the time of the accident he was driving and his wife was a passenger. He entered the intersection from Peter Behr. After stopping behind the limit line, he looked left, then right, then left again before entering the intersection. He did not see Spinner's vehicle approaching from the right as he entered the intersection. Felser's wife yelled "watch out" just before the impact. Felser acknowledged telling the responding officer that his error caused the accident.

Felser's wife testified that after her husband stopped at the stop sign, he waited for some cars to pass, then slowly "inched" into the intersection to get a better look for oncoming cars before accelerating into the intersection.

Spinner was alone in the vehicle at the time of accident. He could not remember the details of the accident but believed he was driving 25 miles per hour or less prior to impact.

Felser's accident reconstruction expert testified that in his opinion, Spinner was speeding at the time of the accident and that had he been driving at the speed limit the accident would not have occurred. He explained that he used a computer program called PC-Crash to run models of the accident based on various assumptions drawn from evidence gathered after

2

the accident, including the type of damage to the cars, the layout of the road and the locations where the cars came to rest. He opined that at the time of impact, Spinner's vehicle was traveling approximately 35 miles per hour and Felser's vehicle was traveling approximately 15 miles per hour. The expert also ran a model with the assumption that Spinner was traveling at 25 miles per hour. According to that model, at 25 miles per hour, Felser's vehicle would have cleared the intersection before the impact and the accident would have been avoided. The expert used the computer program to create digital "flip charts" to illustrate the paths of the vehicles at the different speeds.

The jury found that Felser was negligent and that his negligence was a substantial factor in causing harm. It also found that Spinner was negligent and that his negligence contributed to his harm. It allocated 55 percent of the responsibility to Felser and 45 percent to Spinner. The jury found that Spinner had suffered a total of $2,747,180 in economic and noneconomic damages and that LaRhette had suffered $200,000 in damages for loss of consortium. The parties agree that the judgment entered by the court reduces the amount of damages in proportion to the parties' fault as allocated by the jury. Spinner timely filed a notice of appeal.

**Discussion**

1. *The expert's testimony was properly admitted.*

Trial judges have a substantial "gatekeeping" responsibility over the admission of expert testimony. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 769.) Under Evidence Code[1] sections 801 and 802, the trial court must "exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert

---

[1] All statutory references are to the Evidence Code.

relies, or (3) speculative." (*Sargon, supra*, at pp. 771-772; see also *Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117 ["an expert's opinion based on assumptions of fact without evidentiary support [citation] or on speculative or conjectural factors [citation] has no evidentiary value [citation] and may be excluded from evidence"].) Courts, however, must be "cautious in excluding expert testimony" and "due to the jury trial right, courts should not set the admission bar too high." (*Sargon, supra*, at pp. 769, 772.) "[T]he gatekeeper's focus 'must be solely on principles and methodology, not on the conclusions that they generate.' " (*Id.* at p. 772.) We review the admission of expert testimony for abuse of discretion. (*Id.* at p. 773.)

Here, the expert testified extensively about the materials he reviewed and how he applied his education and experience in reaching his opinions. He determined that the available evidence supported the use of momentum analysis to determine the speeds of the vehicles at impact. He explained, "in a momentum analysis, we want to see how speeds might affect the paths of the vehicles. We've got known points of rest. We know it pretty well. We know vehicle masses. We know . . . mechanically what's called the momentum of inertia. It's resistance to changes in spin. [¶] If we can orient the vehicles to one another along their pre-impact paths of travel and we know their post-impact paths of travel, we can use the principles of impulse momentum to back calculate what the impact speeds are." He used his judgment to make deductions about the evidence and his "engineering knowledge to identify what parameters to use, what kind of braking, what kind of roll-out resistance and things like that." These inputs were entered into the computer program which then performed the mathematical calculations for him.

On appeal, plaintiffs do not contest the methodology used by the expert to reconstruct the accident. They acknowledge that working backward from points of rest is a valid and acceptable methodology. (See *Box v. California Date Growers Assn.* (1976) 57 Cal.App.3d 266.) They contend, however, that the court abused its discretion in admitting the expert's testimony because it lacked evidentiary support and was based on speculative assumptions. They rely on *Jennings v. Palomar Pomerado Health Systems, Inc., supra*, 114 Cal.App.4th at page 1117 in which the court observed that "an expert's opinion that something *could* be true if certain assumed facts are true, without any foundation for concluding those assumed facts exist in the case before the jury, does not provide assistance to the jury because the jury is charged with determining what occurred in the case before it, not hypothetical possibilities."

Plaintiffs challenge the foundational support for many of the inputs used by the expert. First, they question the expert's assumption of the starting point of Felser's car after stopping at the stop sign. At a section 402 hearing and again at trial, the expert testified that he made a number of adjustments to his models between the time of his deposition and trial. In order to bring the vehicles to rest closer to the locations shown by the evidence, he moved the starting point of Felser's car three and a half feet, which extended the distance it traveled prior to impact by about a foot. Plaintiffs argue that the expert never explained how he determined the starting location of Felser's car either before or after he modified his assumption and that the starting point he used at trial conflicted with Felser's testimony as to his stopping position at the limit line. The expert testified, however, that he had reviewed Felser's deposition testimony and understood that he stopped behind the limit line. On cross-examination, the

5

expert opined that prior to the adjustment, the model was "really, really good" and the points of collision and rest were off by only one-half or three-quarters of a foot. The adjustments allowed for greater fidelity to the evidence but did not have a significant effect on the speed of either vehicle.

Next, plaintiffs challenge the expert's assumptions regarding Felser's acceleration into the intersection. The expert testified his model assumes that from his position at the limit line, Felser accelerated at a constant rate of 0.191g until impact.[2] He explained at the section 402 hearing that the rate selected was within the range of what was considered "typical" or in the "every day normal" range of acceleration when somebody leaves a stop sign. Initially, plaintiffs argue that the assumption that Felser accelerated at a constant rate from the limit line is contrary to the testimony that he inched out some distance beyond the limit line before he accelerated. The expert acknowledged that he did not account for the testimony that Felser "inched out" because he could not "quantify rolling out." He added, "I could put in some roll, . . . a slight increase in speed, some flat speed and acceleration to the area of impact to get to the speed that we have here of 15.8" but that would take "[m]ore time for that move to be effectuated." He explained that the relevant factor was the speed at impact necessary to recreate the damage shown by the evidence, not how far Felser's car may have creeped out before accelerating. Because the goal of the analysis was to determine the speed of the cars at the time of impact, how Felser's car "actually gets [to the point of impact] is maybe a secondary question."

---

[2] A "g" is a unit for measuring change in speed over time. It refers to "the average acceleration produced by gravity at the Earth's surface." (Consumer Prod. Safety Guide, NHTSA Issues Notice of Proposed Rulemaking for Accelerator Control Systems, ¶ 40,747.)

Plaintiffs also contend the expert failed to identify the material on which he relied "such as research studies or the like" in determining the typical or normal range of acceleration from a stop sign and he failed to identify evidence in the record to support the assumption that Felser's acceleration rate was typical or normal. At the section 402 hearing, the expert testified that he was registered in California as a professional mechanical engineer and had been working in accident reconstruction analysis for more than 30 years. He also testified that many of the "known parameters" relied on for use in accident reconstruction came from his years of experience. He explained that as a member of the Society of Automotive Engineers he attends an annual meeting where other members "present results of their research, and over the years people have presented results of research associated with crash tests." He also indicated known parameters can come from National Highway Traffic Safety Administration crash test data. Finally, at trial, he identified two journals, "Collision" and "Accident Reconstruction," that he regularly reviews for published studies and crash test results.

The expert testified that his models assume that neither driver made any steering inputs to avoid the impact. With respect to Spinner's car, the expert used a left-steering input to follow the curvature of the road until just before the impact, when he reduced that input. He explained that the steering input was reduced from "8 degrees to 7 degrees" because the roadway "starts to straighten out in that area." Plaintiffs assert that there is no foundation in the record for how he determined the roadway started to straighten. They note that the expert "could not have determined it from a site inspection because he did not visit the site and, in any event, the site had been changed by construction" and there was no evidence he conducted a

photogrammetric analysis from the ariel photograph of the accident site to determine the curvature of the roadway. The expert explained. however, that he conducted his own "investigation to understand the accident site." He "located the accident site on a Google map, and then we went and got aerial photos, and then we scaled some of these aerial photos so we could use them in our later analysis." In any event, the expert opined that the changes made to the models after his deposition should be considered refinements, not the creation of an entirely new model. Ultimately, from an engineering perspective, the changes were insignificant.

Plaintiffs also challenge the expert's determination of the location of the impact. At the section 402 hearing the expert explained that "in this particular case we looked at pre-impact paths. We have some idea where people are going, and we're able to get an aerial photo of the accident site, so we make some deductions about where they're going. [¶] We look where the paths cross. We make some deductions about where the impact might be." Plaintiffs contend that this explanation is too vague and that the expert "never explained how he determined with any precision their pre-impact paths—much less how he determined the precise location where 'the paths cross.' " They also assert that "even assuming the area of impact as determined by [the expert] was accurate, he admitted he thereafter changed the area of impact when he moved the earth in order to make the vehicles roll out to his expected points of rest."

At trial, when asked how he determined the area of impact, the expert testified, "That's a little bit by deduction, and I don't say that we know it to the nearest half-foot or foot. It could be a foot off here or there, maybe even two. It's not going to have a huge effect on our ultimate outcome. [¶] We know the paths of the vehicles, and we have them traveling along their paths to the

point of rest. Sometimes where you're investigating an accident, you'll see gouges on the roadway. You'll see tire marks and things like that from where vehicles interact. We didn't see that in this case. [¶] We just have them taking likely paths to the area of impact, and it's close to what the Traffic Collision Report suggested might be the area of impact." He also testified that the area of impact was only "slightly different" after he adjusted Felser's starting point and that the refinements were not significant to the speed of the vehicles.

With regard to the impact itself, the expert testified that after the initial impact at the front corners of the vehicles, Spinner's car spun and hit the back of Felser's car, causing Felser's car to accelerate. Plaintiffs make two challenges to the expert's assumptions regarding the impact. First, they fault the expert for using a depth of penetration of only 15 milliseconds for the initial impact when he testified that the typical depth of penetration for most crashes is between 80 and 150 milliseconds.[3] The expert explained, however, that when using a momentum model, the "exchange of momentum between the bodies is assumed to occur instantaneously. In most crashes, they last on the order of 80, 100, 120, maybe even 150 milliseconds. They're a lot longer than zero, but it's been found — this is not a bad assumption — to just have the momentum exchange occur just in a moment. It's been tested, and it's been shown to be okay." In this case he reduced the time the vehicles were in contact from 30 milliseconds to 15 milliseconds to reduce the overlap of the vehicles depicted in the visual representation of the model. From an

---

[3] The expert testified that depth of penetration is a function of the time that the vehicles stay together after impact. It is designed to identify the point at which momentum is exchanged between the vehicles.

engineering standpoint, he testified, the reduction "really [didn't] matter that much."

Second, plaintiffs assert that the expert's testimony regarding the second impact was inconsistent with evidence of the damage to the vehicles. Plaintiffs note that the photographs taken after the accident did not appear to show damage across the rear bumper of Felser's car and that the left rear quarter panel of Spinner's car showed tire friction marks from contact with Felser's right rear tire. At the 402 hearing, the expert testified that the second impact was relatively minor and it "may be that it doesn't scar or damage the bumper in a way that would show up in this photo." At trial, the expert described the second impact using the flip chart depicting the accident as follows: "Here's the second impact. The rear tire of [Felser's car] is coming into contact with that tire area of [Spinner's car] where you probably remember in the photos we did see some striations on [Spinner's car] behind the well wheel, and that — the fact that we didn't match that, I mean that's the way it is. I think this is really good that we got a second hit like this. [¶] The fact that we can't match the orientation perfectly is not a surprise. There's all kinds of things we haven't modeled in this collision, how the vehicles are interacting as they actually are exchanging momentum, how the A-arm — do we really know what's happening in the roadway behind. [¶] So though it's not perfect, it's in the engineering world a good analysis and a good model."

Finally, plaintiffs challenge the assumptions underlying the expert's analysis of the vehicles' post-impact roll-out. The expert testified that to explain the roll of the vehicles from the location of the impact to their resting spots, he was required to input resistance parameters for the wheels. He assigned .05g's rolling resistance to the undamaged tires on Felser's car and

.6g's of deceleration at the right front tire that had some damage. He assigned .02g's resistance to the three wheels that were still on Spinner's car and about .55g's for the suspension portion of the car dragging on the road. He also applied some resistance to account for the regenerative breaking feature on Felser's car.

Initially, plaintiffs argue that the expert improperly assumed that the vehicles rolled straight after the impact because some evidence suggests otherwise. The expert indicated however, that he did incorporate some steering on Felser's car after the impact based on photographs showing a slight camber to one wheel. He acknowledged that his model was not perfect but believed that it was "really, really close." He added, "if there is some small curvature in that path, and I'm not saying that there is, that's not going to have a large effect on what kinds of speeds are going to get the vehicles from impact to rest. [¶] . . . [¶] . . . In fact, the curvature, if you want to go further, on a curved path you need more energy, longer path, so it upped the speed. You can argue [I'm] being conservative if it is indeed true that there is curvature in the paths."

Next, plaintiffs assert the expert failed to explain the basis for the resistance numbers applied to the vehicles and that he ignored the effect of the surface change after the collision when the vehicles rolled from the asphalt roadway onto a dirt surface. The expert explained, however, that the resistance numbers he used were "conservative" and that it was not necessary to account for the change in the surface of the roadway because that area represented only a "small portion" of the travel distance of 44 feet.

Finally, plaintiffs assert that there was no evidence to support the assumption by the expert that the regenerative braking feature of Felser's car was activated at the time of the accident. The expert testified, however,

11

that assuming operation of the regenerative breaking feature was consistent with the manual for the car, testing he had conducted with other vehicles, and the physical evidence in this case.

While there was room to challenge the expert's various assumptions and his conclusion, the trial court did not abuse its discretion in admitting his testimony. Although his assumptions were not necessarily accurate to the last degree, that is true in virtually every case. Here, the assumptions were based on observable facts supported by the evidence and the expert's knowledge and experience. There is no showing or indication that the expert's deductions were not of the type customarily and necessarily made by experts in accident reconstruction. Nor is there any basis to question the expert's testimony that the range of differences to which plaintiffs point would not significantly affect his conclusions. The weight to which the opinions were entitled was properly challenged by cross-examination but the lack of certainty does not justify exclusion of the opinion in its entirety. (*Los Altos El Granada Investors v. City of Capitola* (2006) 139 Cal.App.4th 629, 658 [criticisms of expert's opinions goes to weight of the evidence, not to admissibility].)[4]

---

[4] The expert's testimony concerning the 25 miles per hour scenario was subsidiary to his testimony that his reconstruction based on the physical evidence at the scene showed that the Jaguar was travelling at 35 miles per hour. The asserted weakness in the basis for his conclusion that the accident would not have happened if the Jaguar had been travelling at only 25 miles per hour, criticized in the concurrence, was never raised by plaintiffs' counsel, and it is arguable whether such an objection would have gone to the weight of the testimony or required its exclusion. Since no such specific objection was made, we need not resolve that hypothetical question.

2. *Substantial evidence supports the jury's contributory negligence finding.*

Plaintiffs contend that because the expert's "valueless opinion was the only evidence of plaintiff's speed, no substantial evidence supports the finding of contributory negligence." Plaintiff relies on *People v. ConAgra Grocery Products Co.* (2017) 17 Cal.App.5th 51, 83, in which the court explained, " 'Where an expert bases his conclusion upon assumptions which are not supported by the record, upon matters which are not reasonably relied upon [by] other experts, or upon factors which are speculative, remote or conjectural, then his conclusion has no evidentiary value. [Citations.] In those circumstances the expert's opinion cannot rise to the dignity of substantial evidence.' " The court added, "Consequently, a conclusion expressed by an expert cannot provide by itself substantial evidence to support a finding unless the basis for the expert's conclusion is itself supported by substantial evidence. Our substantial evidence review must include a critical examination of the material upon which the experts based their conclusions in order to determine whether that material provides substantial support for those conclusions." (*Ibid.*)

As explained above, the expert's opinion was not "valueless." To the contrary, the expert reasonably relied on his professional experience and education to make deductions based on the physical evidence recovered from the scene and to determine the engineering parameters required to reconstruct the accident. Accordingly, the expert's opinion that Spinner was speeding is sufficient to support the jury's contributory negligence finding.

3. *The trial court did not abuse its discretion in permitting the "flip charts" to be used as demonstrative aids in closing argument.*

At the conclusion of the trial, defense counsel moved to admit into evidence the two "flip charts" that represented visually the expert's models of

the accident based on the alternate premises that Spinner's car traveled at 35 miles per hour and at 25 miles per hour. The court excluded the charts under section 352 on the ground that they were more prejudicial than probative. The court explained, "I think there is a lot of information on here that was not specifically testified to, and in admitting it, I think it would unduly prejudice the jury." Over plaintiffs' objection, however, the court agreed that the flip charts could be used in closing argument as demonstrative aids because they had already been shown to the jury. During closing, defense counsel displayed both exhibits to the jury.

Plaintiffs contend the court abused its discretion in permitting the defense to use the flip charts in closing argument. Initially, they dispute that the flip charts were demonstrative evidence, arguing that the flip charts were inadmissible simulations, not merely computer animations of the expert's testimony. "Demonstrative evidence is physical evidence that is not itself at issue in the case but which illustrates or demonstrates a party's testimony or theory of the case." (Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2019) ¶ 8:470; *People v. Vasquez* (2017) 14 Cal.App.5th 1019, 1036 [" 'Demonstrative evidence is evidence that is shown to the jury as a tool to aid the jury in understanding the substantive evidence.' [Citation.] Common examples of demonstrative evidence include 'maps, charts, and diagrams,' all of which 'illustrate a witness's testimony.' "].) In *People v. Duenas* (2012) 55 Cal.4th 1, the court differentiated between computer animations and simulations: " 'Animation is merely used to illustrate an expert's testimony while simulations contain scientific or physical principles requiring validation. [Citation.] Animations do not draw conclusions; they attempt to recreate a scene or process, thus they are treated like demonstrative aids.' " (*Id*. at p. 20.) On the other hand,

" '[c]omputer simulations are created by entering data into computer models which analyze the data and reach a conclusion.' " (*Ibid*.) "A computer animation is admissible if ' "it is a fair and accurate representation of the evidence to which it relates." ' " (*Id*. at p. 20.) "A computer simulation, by contrast, is admissible only after a preliminary showing that any 'new scientific technique' used to develop the simulation has gained 'general acceptance . . . in the relevant scientific community.' " (*Id*. at p. 21, citing *People v. Kelly* (1976) 17 Cal.3d 24, 30.)

Assuming that Spinner's argument that the flip charts were simulations not animations was sufficiently preserved by his in limine objections—which is not free from doubt, and further assuming that the flip charts were simulations as Spinner contends— admittedly a close question, the testimony nonetheless was properly received. The expert explained that in preparing the flip charts to illustrate how he believed the accident occurred he used PC-Crash as a "tool" to make quicker calculations than he could have done by hand. He also testified that the program was "validated" in various peer-reviewed papers and has been "accepted for use in accident reconstruction" since 1996. The court found that there was sufficient professional acceptance and foundation for the method by which the charts were prepared and there is no basis to disturb that determination. (See *People v. Venegas* (1998) 18 Cal.4th 47, 76 [qualified expert's testimony is sufficient to establish general acceptance of technique].)

Plaintiffs argue further that the use of the flip charts in closing argument was improper because they were excluded from evidence under section 352. The record does not reflect why the court excluded the flip charts though permitting them to be shown to the jury. Felser reasonably suggests that the court excluded the charts because the exhibit, as originally produced

15

for trial, included four pages of calculations that had not been discussed by the expert in his testimony. Regardless of the court's reason, the use of inadmissible exhibits in closing argument is subject to objection. (See 7 Witkin, Cal. Procedure (5th ed. 2020) Trial, § 221.) However, because the flip charts were shown to the jury in connection with the expert's testimony without objection, it was not unduly prejudicial to show them again in closing argument.

## Disposition

The judgment is affirmed. Felser shall recover his costs on appeal.


POLLAK, P. J.

WE CONCUR:

BROWN, J.
TUCHER, J.

16

TUCHER, J., Concurring.

I agree with the majority that the trial court had discretion to admit testimony from Defendant's accident reconstruction expert, Mr. Raymond Merala, purporting to model the accident to show that Plaintiff Felser drove into the intersection at 35 miles per hour.  Some of Merala's input values for this run of the PC-Crash software were thinly sourced, and the match between the simulated accident and the evidence of damage actually sustained by the parties' cars was admittedly imperfect, but these shortcomings go to the weight and not the admissibility of Merala's testimony.  (See maj. opn. *ante*, at p. 12.)  I also agree with the majority that this testimony provided substantial evidence to support the jury's finding of contributory negligence, and that there was no prejudice in allowing the jury to see the flip chart of the 35 mph simulation during closing argument after they had seen it during Merala's testimony.  (See maj. opn. *ante*, at p. 15.)

I reach a different conclusion, however, with regard to Merala's testimony purporting to show that if Plaintiff Felser had been traveling at only 25 mph, the accident would never have occurred.  Masquerading as software-informed expertise, this portion of Merala's testimony and the flip charts used to illustrate it were pure showmanship, lacking any foundation in the trial evidence.  Had trial counsel lodged an appropriate objection and the trial court properly exercised its gatekeeping function, the jury would never have seen this 25 mph run.

Instead, the culmination of counsel's closing argument was the near-miss simulation at 25 mph.  In wrapping up the portion of her closing in which she sought to establish Plaintiff Felser's partial responsibility for the crash, defense counsel played the 25 mph flip chart for the jury with this explanation:  "At 25 miles per hour for [Plaintiffs'] Jaguar, there is no

1

collision. The accident does not happen." Then, for good measure, she showed the jury the same flip chart a second time, observing of the simulated near miss, it "[d]oes not line up with the evidence." Of course it doesn't, as in fact the accident did happen. And the lesson the jury was supposed to draw from these theatrics was that Plaintiff Felser's testimony—that he had been driving at or below the posted speed limit of 25 mph—must have been false.

But the 25 mph flip chart proves no such thing because it was a purely made-up scenario patently at odds with the trial evidence. PC-Crash can calculate a car's speed on impact from other known information, such as the paths the cars traveled to the point at which they crashed, the damage the cars sustained on impact, and the locations to which they rolled. But Merala chose not to use PC-Crash to reverse engineer the accident in this manner. Instead, he "chose to drive the vehicles towards one another and model the impact" under a range of assumptions, looking to see which simulated runs resulted in vehicle damage and roll-out positions similar to those that occurred in real life. Purporting to study whether Plaintiff Felser was driving into the intersection at 35 mph or at 22–25 mph, Merala chose starting locations and speeds (or accelerations) for the vehicles that produced, in his 35 mph run, a simulated accident approximating the vehicle damage and roll-out locations seen in the evidence. Because of the results that run produced, Merala's testimony about the 35 mph scenario was sufficiently grounded in the trial evidence to be properly admitted as expert testimony. But for the 25 mph run, Merala chose a starting point for Plaintiffs' Jaguar that was so far from the intersection that, with the Jaguar's speed set at 25 mph, the car arrived in the intersection only after Defendant's Tesla had safely cleared it. This simulation proves nothing about the accident, nor about the veracity of Plaintiff Felser's testimony, because there is no basis in

2

the evidence for the starting point Merala gave the Jaguar. The 25 mph simulation was purposefully counterfactual, designed to produce a near miss rather than to model the collision that actually occurred.

Merala's attempt to justify the starting point he chose for the Jaguar does not withstand scrutiny. He explained that for his 25 mph simulation he started the Jaguar at the spot from which, *if the car had been moving at 35 mph*, it would have hit the Tesla in the intersection 3.76 seconds later. There is no logical basis for using this starting point in the 25 mph simulation. If the Jaguar was traveling toward the intersection at 35 mph, then at 3.76 seconds before the accident it would have been appreciably farther from the intersection than if it had been approaching the intersection at 25 mph. We know this because the trial evidence unequivocally establishes that the two cars collided in the intersection, rather than barely missing each other. There was no independent evidence in the trial record of the Jaguar's location 3.76 seconds before the accident. Merala simply derived a starting point by reverse engineering from the point of impact, assuming the Jaguar's trajectory at 35 mph. He could have similarly derived a starting point for the Jaguar, assuming it was traveling at 25 mph. That point would have been much closer to the intersection—close enough to result in a collision if it was to have any bearing on the case. But Merala chose not to illustrate any such scenario, instead presenting to the jury a simulation designed to mislead them into thinking that if Plaintiff Felser had been traveling 25 mph the accident would never have happened.

I believe that the trial court, in its role as gatekeeper, should not have allowed Merala to testify to this 25 mph simulation because for this run there was " 'too great an analytical gap between the data and the opinion proffered.' " (*Sargon Enterprises, Inc. v. University of Southern California*

3

(2012) 55 Cal.4th 747, 771; see also *Pannu v. Land Rover North America, Inc.* 191 Cal.App.4th 1298, 1318 [in accident reconstruction, admissibility of experimental evidence depends on whether experiment was "conducted under substantially similar conditions as those of the actual occurrence" (italics omitted)]; *Culpepper v. Volkswagen of America, Inc.* (1973) 33 Cal.App.3d 510, 521 [same].)

But although Plaintiffs argued in the trial court and in this court that there was insufficient foundation for Merala's testimony, they have made no argument specific to the 25 mph scenario. They argue "eight examples of data inputs used by Mr. Merala that were either contrary to or unsupported by the evidence," but the starting point for the Jaguar in the 25 mph run is not one of them. "In our adversary system . . . we follow the principle of party presentation," deciding only those issues presented by the litigants, so it would be improper to decide this case on the grounds that the 25 mph simulation should not have been presented to the jury. (*Greenlaw v. United States* (2008) 554 U.S. 237, 243–244.)

Because Plaintiffs did not object to the starting point for the 25 mph scenario, and because I am unpersuaded that the eight data inputs they do challenge lack sufficient evidentiary support, I concur in the majority opinion affirming the judgment.

TUCHER, J.

4