Filed 4/27/22  In re Mi.Q. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


|  |  |
|---|---|
| In re Mi.Q., a Person Coming Under the Juvenile Court Law. | D079738 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. No. NJ15777C) |
| Plaintiff and Respondent, | |
| v. | |
| R.Q., | |
| Defendant and Appellant. | |


APPEAL from an order of the Superior Court of San Diego County, Michael Imhoff, Commissioner.  Affirmed.

Lelah S. Fisher, under appointment by the Court of Appeal, for Defendant and Appellant.

Lonnie J. Eldridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Eliza Molk, Deputy County Counsel, for Plaintiff and Respondent.

When Mi.Q. (Minor) was just over two months old, he sustained an unexplained fracture of his right arm above the elbow while he was in the exclusive care of his parents. Medical experts unanimously agreed that the injury was inflicted because an infant his age could not cause the injury himself. Three physicians opined that the injury was more likely than not related to physical abuse because they did not believe that the parents had offered a reasonable explanation for accidental trauma to Minor's arm.

R.Q. (Father) appeals the juvenile court's order finding true allegations that Minor is a child within the jurisdiction of the juvenile court under Welfare and Institutions Code section 300, subdivision (a),[1] declaring Minor a dependent, and placing him with his parents under a family maintenance case plan. Father contends that the court's jurisdictional finding is not supported by substantial evidence because one expert opined that the parents' description of an encounter between an older child and Minor presented the "possibility" that the injury had been accidental.

Father challenges the juvenile court's jurisdictional findings as to both himself and Mother because the court did not make separate factual findings as to each parent to support independent grounds for jurisdiction. The San Diego County Health and Human Services Agency (Agency) contends that this court should not consider Father's claims under the justiciability doctrine because there would still be jurisdiction over Minor, since Ma.Q. (Mother) has not appealed.

We conclude that Father has standing to appeal the jurisdictional finding as to both parents because the juvenile court's jurisdictional findings as to Father and Mother are so interwoven that if we were to reverse the

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

2

finding as to Father, we would effectively be reversing as to Mother, as well. We therefore do not reach the issue of justiciability. On the merits, we conclude that there is substantial evidence supporting the juvenile court's jurisdictional finding. We therefore affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Discovery of Injury.*

In the early morning of August 29, 2021, Father noticed that Minor's right arm was dangling on the side of his body when Father removed him from a baby swing to feed him. Later that morning, after consulting with a relative, the parents took Minor to an urgent care facility where the physician considered nursemaid's elbow and attempted reduction.[2] After reduction attempts were unsuccessful, Minor was sent to the emergency room at Rady Children's Hospital for further evaluation. Imaging at the hospital revealed an acute angled fracture of the upper arm bone above the elbow. The fracture was non-displaced, meaning that the bones remained aligned.

B. *Parents' Statements.*

Both parents denied hurting Minor and denied knowing how the fracture could have occurred. They said that Minor was always supervised

---

[2] Nursemaid's elbow is a common, often accidental, injury in young children that results from being pulled or lifted by the hand or wrist. The head of the radius is subluxated, or partially dislocated, from the annular ligament. A child often refuses to use the affected arm. (Stedman's Medical Dict. (28th ed. 2006) pp. 619 [nursemaid's elbow], 1125 [Malgaigne luxation], 1856 [radial head subluxation]; Harwood Nuss' Clinical Practice of Emergency Med. (2014 6th ed.), ch. 285, Nursemaid's Elbow, pp. 1278–1279 [treatment commonly involves attempting reduction by cradling the elbow with one hand while the examiner moves the child's forearm and hand (hyperpronation and/or supination) until a "click" is felt].)

when his three older brothers interacted with him.  Minor's brothers share a bedroom while Minor shares a bedroom with the parents.

Father was home with the children on Saturday, the day before the injury was discovered.  Minor was next to him the entire day as Father played videogames with the older children.  When Mother got home from work at around 3:30 p.m., Minor was sleeping.  She changed him and the family went shopping together.  Minor was not fussy and was behaving normally.

When they returned home, Minor was lying on his back on a C-shaped "Bopee" pillow while Mother prepared dinner.  Mother observed her 19-month-old child do a "little dance" and raise Minor's arms.  The older boy pulled Minor by both arms "straight forward," let go, and then pulled him again.  Mother said that the older child lifted Minor slightly, but the infant's bottom did not leave the pillow.  Mother said that the pull did not last for even a second.  Minor cried immediately after the incident.

Minor was fine when Mother gave him a bath that evening.  He did not cry when she lifted his arm.  She said that he screamed when she applied lotion, which she thought was unusual.  Mother was away from the home between 8:45 p.m. and midnight.  Father fed Minor, swaddled him, and put him to sleep in a baby rocker.

Father noticed that Minor's arm was limp at around 4:00 a.m. on Sunday, August 29, 2021.  Minor was not fussy or crying. The parents sought care later that morning.

C.    *Initiation of Dependency Proceedings.*

When the fracture was discovered, the emergency room physician and a social worker contacted Premi Suresh, M.D., a child abuse expert at Rady's Children's Hospital, who reviewed the case documentation, including

documentation from the urgent care facility indicating that a one-year-old sibling "pulled the baby from the boppy on the couch yesterday" and that since 4:00 a.m., Minor had not been using his right arm. Dr. Suresh opined that a fracture in a two-month-old infant was "definitely" an inflicted injury because the infant would not be able to cause the fracture on his own. Dr. Suresh further stated, "the history being provided that the [one-year-old] sibling caused the fracture is also highly concerning as it is not plausible that the [one-year-old sibling] could fracture an infant's arm by simply pulling on the baby's arm." She believed that the injury was "highly concerning for physical abuse" and recommended a thorough investigation by child welfare services and implementation of a safety plan.

An investigating detective also expressed strong concern for Minor's safety under the parents' care, given the lack of a plausible explanation for the fracture. He said that neither parent could be ruled out as a suspect.

The Agency obtained a protective custody warrant and filed a petition on September 8, 2021, alleging that Minor was a person within the jurisdiction of the juvenile court under section 300, subdivision (a) because his injury occurred while in the care of his parents and was highly concerning for physical abuse. The Agency recommended detention of Minor out of the home. The parents agreed to participate in a safety plan. They volunteered to leave the home and to allow the maternal grandmother to care for the children in the home.[3]

---

[3]    The Agency also expressed concern that the 19-month-old sibling was vulnerable and at risk of physical injury due to his young age and because he was nonverbal. The Agency recommended detention of the 19-month-old sibling out of the home and that a four-year-old sibling be detained in the care of the parents under supervision. The Agency did not recommend oversight of a nine-year-old sibling. The court later dismissed the petitions for Minor's two older siblings after concluding that the Agency had not

At the detention hearing on September 9, 2021, the court determined that the Agency had made a prima facie showing that Minor was a person described by section 300, subdivision (a) and ordered him detained in an approved relative home.

D. *Physician Evaluations.*

The jurisdiction and disposition report dated September 30, 2021, included evaluations from two additional pediatricians who specialize in evaluating possible child abuse. Sarah Vega, M.D., a pediatric fellow, opined that an oblique fracture is caused by a combination of bending and torsional forces. A thorough evaluation did not reveal a medical cause for the fracture. Because there was no plausible trauma history to explain the fracture, Dr. Vega believed that the facture was consistent with an inflicted injury. She was of the view that Minor would be at risk of further maltreatment if returned to the environment in which his injury was sustained. Shalon Nienow, M.D., the attending pediatrician, agreed with Dr. Vega's findings and plan. Dr. Nienow clarified, that "[i]n the absence of a reasonable accidental trauma history, the injury sustained by [Minor] is more likely than not related to physical abuse."

Before the contested adjudication and disposition hearing, the Agency submitted an addendum report dated November 5, 2021, with additional expert statements. The addendum included a report obtained by Mother's counsel from Lisa Miller, M.D., an expert in pediatric orthopedic injuries. Dr. Miller was of the view that Mother had provided a reasonable explanation for the injury. Dr. Miller commented that Dr. Suresh's

_____

carried its burden to establish jurisdiction under section 300, subdivision (j). That ruling is not at issue in this appeal.

6

statement indicated that the older sibling who had pulled on Minor's arm was one year old whereas Dr. Miller believed the older child was 16 months old. According to Dr. Miller, a 16-month-old child "could potentially have caused the injury." Dr. Miller agreed that the injury is caused by twisting or traction and twisting. She thought that Minor "could have been injured" based on Mother's description of the older child pulling Minor's arm on two occasions, the second time with enough force to lift Minor slightly off the pillow. Minor cried immediately after the arm was pulled. Although Minor did not fuss when Mother bathed him, Dr. Miller thought that this could occur if the arm were not twisted or moved in such a way as to move the fracture fragments, which would cause pain. When Mother applied lotion, she may have moved the arm sufficiently to cause the fracture to hurt. Dr. Miller concluded, "[w]ith this plausible explanation of the injury, I do not think that [Minor]'s fracture was necessarily the result of abuse."

Dr. Suresh reviewed Dr. Miller's letter and disagreed with her opinion. Dr. Suresh reiterated that the injury was "definitely inflicted because an infant that age could not cause [the fracture] to himself accidentally. Someone else had to inflict it on him. The crux of my opinion is that I do not believe a 16[-]month[-]old infant could break the child's arm by pulling it." Dr. Suresh pointed out that a 16-month-old is considered a one-year-old child and she did not believe that a 16-month-old child could have caused the injury. She suggested that the baby may have cried out when his arm was pulled because it was already broken.

Dr. Nienow also reviewed Dr. Miller's letter and disagreed with her opinion. Dr. Nienow explained that Dr. Vega specifically discussed the event involving the older child with the parents during her visit. "Mother reported that she witnessed [the older child] grab both of the arms and when told not

7

to do so he let them go.  [Minor] did not cry out in pain during this event.  Nor did [the older child] twist/pull the arm.  Fractures are excruciatingly painful at the time that they are incurred and every time the fracture fragments are manipulated thereafter.  The pain symptoms from the initial event would have been very obvious."  She also disagreed that there is a significant difference between the abilities of a 12-month-old and a 16-month-old to cause this injury.  "A toddler of this age would not be able to generate enough force to cause a fracture of an infant."  In Dr. Neinow's opinion, Mother's "manipulation of the arm during the bath without crying or pain symptoms raises suspicion that the fracture was not present at this time.  When fractures are present infants will self-splint (not move the limb) in an effort to prevent pain symptoms from occurring.  This was witnessed by [F]ather at [4:00 a.m.].  This shows that movement of the arm was acutely painful for him."

E.    *Contested Adjudication and Disposition Hearing*

1.    *Agency Evidence.*

At the contested adjudication and disposition hearing in November 2021, the court received in evidence the detention report of September 9, 2021, the jurisdiction report dated September 30, 2021, and the November 5, 2021, addendum report.  The Agency rested without presenting additional evidence.

2.    *Mother's Evidence.*

Mother's counsel cross-examined the Agency's social worker about the Agency's reports and its follow-through with physician recommendations for investigation.  On re-direct, the worker expressed serious concern that a two-month-old child had a broken arm without a plausible explanation.  Three medical experts stated that the older sibling could not have fractured the

8

Minor's arm. The worker stated that was "extremely scary and worrisome." However, the social worker stated that "with services . . . and the Agency being mindful and watching over this family" she believed that the children could be safe on a family maintenance plan.

Mother's counsel called Dr. Miller to testify. Dr. Miller agreed with the diagnosis of a non-displaced humeral shaft fracture. The oblique, or diagonal, nature of the fracture was important for determining the mechanism by which it occurred. The fact that the fracture was non-displaced was important because a nondisplaced fracture can be less painful than a displaced fracture.

She agreed the fracture was acute, meaning it happened shortly before the exam and x-ray. She also agreed that the injury had been inflicted because Minor was too young to have sustained the injury himself.

Dr. Miller thought that the older child pulling on Minor's arm was a plausible or reasonable explanation for the injury, absent abuse. She believed that Mother had said that the child pulled Minor a second time by one arm and that Minor had come up off the pillow, whereas in the first episode, the Minor's bottom had not come up off the pillow.

Dr. Miller agreed that an oblique fracture is generally caused by twisting or rotation. She said that it was unknown whether the older child had made a violent or twisting injury while lifting Minor, but noted that Minor cried after the second episode. Although Minor was not uncomfortable when Mother bathed him, he shrieked when she applied lotion. Dr. Miller thought that this indicated "a possibility that maybe the injury occurred"

with the older child, who was described as being jealous of the Minor and "rough" with him.

Dr. Miller said that the older child was actually 19 months old at the time of Minor's injury. She thought that a 19-month-old child would be larger and more stable than a 12-month-old child and could have caused the injury. When asked whether it was more plausible that a 19-month-old child could have caused the injury than a 16-month-old, she said, "Yes. Perhaps." When asked again, Dr. Miller said, "we also don't know perhaps if [the older child] grabbed on the arm and had a fall, trip-and-fall. You know, and that would have generated more force than just pulling and twisting. So – I just think it was plausible. It was just a possibility." She believed that it was appropriate to investigate the Minor's injury and to involve a social worker at the hospital, but she thought that the physicians should have considered the parents' explanation "as a possibility."

On cross-examination, Dr. Miller explained that she had inferred that there were two episodes of pulling based on how the detention report was written. She thought that Mother had described the first episode as the older child pulling Minor by both arms "straight forward" and the Minor's bottom did not "leave the pillow," and that this pull did not last for even a second. The older child immediately let go when she yelled at him. The report stated that the older child did not pull the Minor after Mother yelled at him. However, Dr. Miller thought that the report described a second episode based on another passage that stated, "[M]other said that when she was cooking dinner, [the older child] grabbed the newborn from his 'bopee' on the couch. . . . [Mother] said, 'I yelled at [the older child] and he jumped back and

10

then my newborn fell back into the 'bopee.'  [Mother] said that [Minor] was crying right after [the older child] pulled on him."[4]

Dr. Miller inferred that when Mother said that the older child "grabbed" the newborn, he had pulled only one arm because some earlier reports from the urgent care and the hospital referred to "arm," not "arms." She agreed that she did not know whether the older child grabbed one or both arms.

Dr. Miller agreed that if the detention report intended to describe only a single episode that involved pulling on both arms and Minor's buttocks had not left the couch, then she would change her opinion and not offer it as an explanation for Minor's injury.

The court inquired further of Dr. Miller regarding what she understood to be a second episode.  Dr. Miller explained that, where Mother said that the older child "grabbed" Minor, Dr. Miller assumed that the older child had grabbed Minor by one arm.  Dr. Miller agreed that if the older child grabbed Minor by both arms it is less likely that one arm was rotated to cause the injury.  A rotational injury would have to be forceful, even if by accident.  The torsion or twisting required for the fracture would be lacking if the child was grabbed by both arms.

Dr. Miller testified that Mother's description of the event provides a "possibility" for the injury.  She thought, however, that it would be difficult to

---

[4]     The statements in the detention report appear to be drawn from a statement of cause submitted with a protective custody warrant affidavit early in the case.  This statement included a social worker's description of Mother's initial statements made on August 29, 2021, and also a description of Mother's statements made to a different social worker later on the same day.  The second social worker testified on rebuttal that he had typed two descriptions of the same incident.

11

say that the older child grabbing and lifting Minor by the arms is more likely than not the cause of the injury. Rather, it is merely within the matrix of "possible causes." Dr. Miller could not say to a medical certainty that the older child caused Minor's injuries.

3. *Rebuttal Evidence.*

In rebuttal, the Agency called an emergency response social worker who had interviewed Mother on August 29, 2021. His report is incorporated in the detention report. He testified that he generally asks a parent to describe a timeline of any plausible explanation for how the injury could have occurred. Mother said that while she was cooking dinner, she noticed the older child pull Minor forward. She described it as "a very light pull" and said that Minor's "butt did not leave the pillow" and that the pull had not lasted for "even a second." When the social worker asked Mother to describe the incident further, she explained what she had been doing and where the children were at the time the incident occurred. There are two descriptions of the same event in the report because the social worker was typing while Mother was talking.

Mother described a single encounter in which the older child pulled Minor, let him go, and pulled him again. Mother said that the older child pulled Minor by both arms, straight forward, and that the Minor's bottom did not leave the pillow. The social worker said that Minor cried after the first pull in which he was lifted. The older child pulled again as Mother yelled and he let go. Mother said that it had all happened quickly.

4. *Court's Ruling.*

The juvenile court indicated that it had considered the reports and listened carefully to the testimony. The court noted that there was "complete unanimity" among all experts that the injury was inflicted. "So the real issue

12

for the [c]ourt is how and who." The court believed that Mother had honestly recounted what she saw, but questioned whether a 19-month-old toddler had sufficient strength "to cause the torsion necessary to produce this specific injury in his brother." Dr. Miller agreed that it was much less likely that the older child could create the requisite torsion to cause the injury if the older child had grabbed both of Minor's arms. Even when the older child pulled Minor again, the court observed that there was "nothing in that explanation that gives rise to the fact that [the older child] utilized the required torsion motion with the sufficient strength to have [Minor] sustain his injury." The court concluded that "the record before the [c]ourt does not indicate that [the older child] caused the specific injury to [Minor]."

The juvenile court did not find Dr. Miller's testimony helpful in understanding how the older child could have caused the injury. "She said it was a possibility, but a possibility is a very broad term. It does not focus the [c]ourt's attention to the specifics of what she sees in the conduct of [the older child] vis-a-vis the required torsion of the arm to create this injury." The court found her opinion was not "grounded sufficiently in the record before the [c]ourt that would persuade the [c]ourt otherwise." The court found that the Agency had carried its burden as to jurisdiction over Minor by a preponderance of evidence. "[T]here is no disagreement in the record that this is an inflicted injury. The [c]ourt has concluded that there's no reasonable explanation." The court made a true finding on the petition, finding by a preponderance of the evidence that Minor is a person described under section 300, subdivision (a). The court restored physical custody and

placed Minor with his parents, approved the case plans, and set a family maintenance review hearing.

DISCUSSION

I.

*Father Has Standing to Appeal As to Both Parents*

At the outset, the Agency contends that this court should not reach the merits of Father's appeal based on the doctrine of justiciability. Because Mother did not appeal the finding against her, the Agency contends, the finding of jurisdiction over Minor would stand even if we were to reverse the finding as to Father. (*In re L.O.* (2021) 67 Cal.App.5th 227, 237, quoting *In re Briana V.* (2015) 236 Cal.App.4th 297, 308 [" '[A] jurisdictional finding good against one parent is good against both.' "].)[5] Because the court did not make separate jurisdictional findings as to each parent, Father asserts that he has standing to challenge the court's jurisdictional finding as to both himself and

---

[5] "Under the doctrine of justiciability, courts generally do not act upon or decide moot questions or abstract propositions, nor do they issue advisory opinions. [Citation.] 'An important requirement for justiciability is the availability of "effective" relief—that is, the prospect of a remedy that can have a practical, tangible impact on the parties' conduct or legal status.' [Citation.] 'For this reason, an appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence' or is unchallenged." (*In re L.O., supra,* 67 Cal.App.5th at p. 237.) Courts have recognized an exception to this rule to permit a reviewing court to exercise discretion to reach the merits of a challenge to a jurisdictional finding " 'when the finding (1) serves as the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or (3) "could have other consequences for [the appellant], beyond jurisdiction" [citation].' " (*Ibid.,* citing *In re Drake M.* (2012) 211 Cal.App.4th 754, 762–763.)

14

Mother. Alternatively, Father asks us to exercise our discretion to reach the merits of his challenge to the jurisdictional finding under an exception to the justiciability doctrine. We agree that Father may challenge the jurisdictional finding as to both parents in this case.

"As a general rule, ' "where several persons are affected by a judgment, the reviewing court will make no determination detrimental to the rights of those who have not been brought into the appeal." ' [Citations.] The rule is not inflexible, however. [Citation.] 'Where portions of a judgment adverse to a nonappealing party are inextricably interwoven with the whole judgment, a general reversal may be ordered to do complete justice.' " (*Union Pacific Railroad Co. v. Ameron Pole Products LLC* (2019) 43 Cal.App.5th 974, 986, citing *Estate of McDill* (1975) 14 Cal.3d 831, 840; see also *In re C.W.* (2019) 33 Cal.App.5th 835, 866 [court reversed both a custody order and an order terminating jurisdiction "because the two rulings are interwoven and connected."].)

" 'Where the interests of two parties interweave, either party has standing to litigate issues that have a[n] impact upon the related interests. This is a matter of first party standing.' " (*In re Caitlin B.* (2000) 78 Cal.App.4th 1190, 1193, citing *In re Patricia E.* (1985) 174 Cal.App.3d 1, 6 [where minor did not appeal, father had standing to raise the right of the minor to have independent counsel because their interests were intertwined], disapproved on other grounds in *In re Celine R.* (2003) 31 Cal.4th 45, 60.) Standing to appeal should be construed liberally. (*In re K.C.* (2011) 52 Cal.4th 231, 236; Code Civ. Proc., § 902 ["Any party aggrieved may appeal . . . ."].)

The juvenile court based its jurisdiction finding on the fact that Minor sustained an inflicted injury while in the parents' care, with no reasonable

explanation. The court made no specific findings independently supporting jurisdiction as to either parent. Because the interests of both parents in terms of the jurisdictional finding are entirely interwoven in this case, it would be appropriate to reverse the jurisdictional finding as to both parents if we were to conclude that there is any reversible error. (*In re C.W.*, *supra*, 33 Cal.App.5th at p. 867 ["An appellate court ' "must have power to do that which justice requires and may extend its reversal as far as may be deemed necessary to accomplish that end." ' "]; *Estate of Sanderson* (1960) 183 Cal.App.2d 740, 743 [reversal of order applied to all distributees of a will even though only one beneficiary appealed]; compare *In re E.E.* (2020) 49 Cal.App.5th 195, 212, fn. 2 [court did not reach the issue of whether mother had standing to challenge the evidentiary basis for jurisdictional allegations against father where substantial evidence supported the decision based on mother's conduct alone; the court reversed a disposition finding as to father because mother's interests were related].) We therefore consider the merits of the appeal without reaching the issue of justiciability or whether any exception to that rule applies.

## II.

*Substantial Evidence Supports the Jurisdictional Finding*

Father contends that the juvenile court's jurisdictional finding is unsupported by substantial evidence because the parents presented a plausible accidental explanation for Minor's injury based on the incident with the older child, and Dr. Miller testified that this incident could have caused the injury. We disagree.

"The court asserts jurisdiction with respect to a child when one of the statutory prerequisites listed in section 300 has been demonstrated." (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1491.) Section 300, subdivision (a) provides

a basis for dependency jurisdiction when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian."  A juvenile court must find jurisdictional allegations true by a preponderance of evidence.  (§ 355; *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248.)

Allegations under section 300 may be sustained even if the cause of the child's injuries is unknown.  (See *In re A.S.* (2011) 202 Cal.App.4th 237, 245–246 [jurisdiction under section 300, subdivision (b) was proper where the parents could not be ruled out as perpetrators of the child's injuries], disapproved of on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7; *In re Christina T.* (1986) 184 Cal.App.3d 630, 640 [jurisdiction under section 300, subdivisions (a) and (d), was supported when it could not be ascertained whether the father or mother's boyfriend sexually abused the child]; *In re E.H.* (2003) 108 Cal.App.4th 659, 670 ["where there is no identifiable perpetrator, only a cast of suspects, jurisdiction under [section 300] subdivision (e) is not automatically ruled out"].)  " 'Unlike criminal proceedings, where establishing the identity of the perpetrator is paramount, the purpose of dependency proceedings [is] to fashion appropriate orders in the best interest of the child. . . .' [Citation.]  If a perpetrator's identity must be conclusively established, 'a family could stonewall the [social services department] and its social workers concerning the origin of a child's injuries and escape a jurisdictional finding. . . .' " (*In re A.S.*, at p. 245.)

We review the juvenile court's jurisdictional findings for substantial evidence.  (*In re Isabella F.* (2014) 226 Cal.App.4th 128, 137.)  " 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them.  "In making this determination, we draw

17

all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.) However, "[s]ubstantial evidence is not synonymous with any evidence. [Citation.] To be substantial, the evidence must be of ponderable legal significance and must be reasonable in nature, credible, and of solid value." (*In re M.S.* (2019) 41 Cal.App.5th 568, 580.)

The record shows that Minor was within the exclusive care of his parents at the time the injury occurred. Both Mother and Father stated that Minor was never left unsupervised with any of the other children. Each medical professional agreed that the injury was inflicted by someone because the infant could not have broken his own arm.

Three medical experts agreed that Mother's description of the encounter with the older child pulling on Minor's arms was not a plausible explanation for Minor's injury. The court considered Dr. Miller's opinion that the incident with the older child could provide a "possible" explanation for the injury, but ultimately determined that her opinion was not helpful because it was not grounded in the evidence. Upon cross-examination and further inquiry from the court, it was apparent that Dr. Miller inferred more from a second pulling incident than the evidence would support. She believed that the older sibling had pulled only one arm during the second pull. But there is nothing in any of Mother's statements suggesting that is the case. Dr. Miller

18

admitted that she did not know whether the older child had "grabbed" one or two arms in the second pull.

Dr. Miller agreed that Minor's injury required forceful rotation of the arm, even if by accident. She also agreed that if the older child had grabbed Minor by both arms, it was less likely that the older child could exert the torsion necessary to cause an oblique fracture. Dr. Miller suggested that it was possible that the older child could have tripped and fallen while holding the Minor's arm, which could generate more force than pulling or twisting. She also suggested that Minor could have fallen to one side if held by only one arm and that gravity may have exerted more force. But there is nothing in the record to support either supposition. Mother's statements indicate that she witnessed the entire encounter and did not describe any such event. In fact, Dr. Nienow stated that Dr. Vega specifically discussed the episode with Mother. She said that the older child did not "twist/pull" Minor's arm. As the court stated, nothing in Mother's explanation "gives rise to the fact that [the older child] utilized the required torsion motion with sufficient strength to have [Minor] sustain his injury."

The court was well within its province to weigh the opinions of the experts and determine that Dr. Miller's opinion was not helpful. Dr. Miller could not state that the encounter with the older child more likely than not caused Minor's injury. She said only that it provided a "possible" explanation. That possibility was diminished when Dr. Miller was pressed as to the foundation for her opinion and it became apparent that her assumptions and inferences were not grounded in the evidence. An expert opinion based on some theoretical possibility when the cause remains one of pure speculation or conjecture is not useful for a trier of fact. (*People v. Prunty* (2015) 62 Cal.4th 59, 84–85.) An expert's opinion must contain "a

19

reasoned explanation illuminating why the facts have convinced the expert, and therefore should convince the [trier of fact], that it is more probable than not" that an act was a cause of injury under a preponderance of evidence standard. (See *Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117–1118, italics omitted.)

We conclude that substantial evidence supports the juvenile court's jurisdictional findings under section 300, subdivision (a). The undisputed evidence of an inflicted injury while Minor was within the exclusive care of one or both of his parents and the absence of a reasonable explanation for his injury constitutes substantial evidence that one or both parents are responsible for the injury. (*In re D.P.* (2014) 225 Cal.App.4th 898, 903.)

DISPOSITION

The November 8, 2021 order is affirmed.

AARON, Acting P. J.

WE CONCUR:

IRION, J.

DO, J.

20