Filed 5/3/23  Leon v. Hughes CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| MADISON LEON, a Minor, etc., et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>KENNETH B. HUGHES,<br><br>    Defendant and Respondent. | B307344 c/w B308358<br><br>(Los Angeles County Super. Ct. No. BC573903)<br><br>**ORDER MODIFYING OPINION, DENYING REHEARING, AND DENYING REQUEST TO PUBLISH OPINION** |

IT IS ORDERED that the opinion filed in the above-captioned matter on April 19, 2023, be modified as follows:

On page 26, in the fourth sentence beginning with "The matter is remanded for a new trial," the sentence is replaced with a new sentence that states: "The matter is remanded for a new trial on the issue of causation and other proceedings consistent with our opinion."

There is no change in judgment.

The petition for rehearing filed by respondent Kenneth Hughes on April 28, 2023, is denied.

The request to publish opinion is denied.

_____

RUBIN, P. J.                BAKER, J.                MOOR, J.

Filed 4/19/23  Leon v. Hughes CA2/5 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| MADISON LEON, a Minor, etc., et al.,<br><br>　　　Plaintiffs and Appellants,<br><br>　　v.<br><br>KENNETH B. HUGHES,<br><br>　　　Defendant and Respondent. | B307344 c/w B308358<br><br>(Los Angeles County Super. Ct. No. BC573903) |

APPEAL from a judgment of the Superior Court of Los Angeles County, James A. Kaddo, Judge.  Reversed and remanded with direction.

Law Offices of Michael E. Reznick, Michael E. Reznick and Lawrence J. Semenza for Plaintiffs and Appellants.

Cole Pedroza, Kenneth R. Pedroza and Matthew S. Levinson; Law Offices of Howard A. Kapp and Howard A. Kapp for Defendant and Respondent.

————————————————

Plaintiffs are Desiree Landaverde, an individual, and William Leon, as guardian ad litem for Madison Leon, a minor. Plaintiffs sued Kenneth Hughes, M.D. (defendant), and others, for the wrongful death of Arleen Vasquez, who was Desiree and Madison's mother, alleging defendants' negligence caused Arleen Vazquez's death. After the jury reached a verdict for plaintiffs, the trial court issued a partial judgment notwithstanding the verdict (JNOV) in defendant's favor on the issue of causation. In the alternative, the trial court granted defendant's new trial motion. The court thereafter entered judgment for defendant. We reverse the JNOV and remand the matter for a new trial on the issue of causation.

## FACTS

"Because this is an appeal from a judgment notwithstanding the verdict, we state the facts in the light most favorable to the verdict." (*Flanagan v. Flanagan* (2002) 27 Cal.4th 766, 769.)

### 1. *The Surgery*

On August 4, 2014, defendant performed a cosmetic surgical procedure known as a Brazilian butt lift on decedent Vasquez. Dr. Randal May served as the anesthesiologist in the surgery. The procedure involved the liposuction of fat from Vasquez's arms, inner thighs, flanks, and back to her buttocks.[1] To access these areas, defendant made incisions to create "port entries" at the back of Vasquez's arms above the elbows, at the left and right groin crease, and at her sacrum. Defendant then injected a solution into the extraction areas and used different

---

[1]    Defendant testified the flank area was part of the lower back near the kidneys.

cannulas to suction the fat out of her body and inject it into her buttocks.[2] After defendant harvested the fat from Vasquez's arms and thighs, the surgical team flipped Vasquez to lie on her stomach. Defendant then harvested fat from her flanks. After the fat was separated from the solution, a "blunt" cannula was used to inject the fat into the buttocks through the port at the sacrum.[3] Defendant described the procedure in his operative report this way: "fat was suctioned in fanlike and criss-crossed fashion to avoid irregularities. Care was taken to feather the suctioned areas." Defendant completed the surgery at 11:30 a.m. and left the operating room. Approximately half an hour later, Vasquez's heart rate dropped and she did not respond to medication. Dr. May, the anesthesiologist, began CPR and staff called paramedics. When emergency personnel arrived, Vasquez had no pulse and was not breathing. She was transported to the hospital, where the emergency room doctor administered "tPA [tissue plasminogen activator] [¶] . . . [¶] for the possibility of

---

[2]    A cannula is a hollow tube-like device with small holes at the end that defendant used to inject or suction fat. Although there are many different sizes and designs of cannulas, the cannulas used in Vasquez's surgery generally measured a little over 0.1 inch in diameter (three to four millimeters) and 12 inches long with an additional four- to six-inch handle.

[3]    Defendant's operative report indicated he used a "liposuction" cannula to harvest fat and a "blunt" cannula to inject the fat. At trial, defendant explained all cannula, no matter what kind of tip is used, are blunt. One of plaintiffs' experts testified it was common to use a cannula with a "slightly sharper and flattened tip" to inject fat but acknowledged he did not know what type of tip defendant used in Vasquez's procedure.

[pulmonary embolism], although . . . suspect[] . . . may be fat emboli.  However, [there was] no response with tPA."[4]  Vasquez was pronounced dead at the hospital at 1:45 p.m.  Her death certificate identified "exsanguination by traumatic wound of right internal iliac artery" as the cause of death.[5]

2.    *The Lawsuit*

On February 26, 2015, plaintiffs brought suit against defendant, Dr. May, George Boris, M.D., and the surgical center owned by Dr. Boris (where the surgery was performed; collectively referred to as Boris).  Plaintiffs asserted claims for wrongful death caused by medical malpractice, violation of the False Advertising Law, violation of the Unfair Business Practices Act, and violation of the Consumer Legal Remedies Act.

On July 26, 2017, the trial court granted defendant Hughes's motion for summary adjudication as to all causes of action except for wrongful death.  Also prior to trial, the case was resolved as to the remaining defendants.

The single wrongful death claim against defendant Hughes was tried before a jury in 2018.  The jury reached a verdict for defendant, but the trial court (Judge Lisa Hart Cole) granted a mistrial based on juror misconduct.

---

[4]    A pulmonary embolism occurs when a blood clot travels from a vein in the lower extremity up to the lung.  Tissue plasminogen activator or tPA is used to dissolve blood clots.  A fat embolism occurs when pieces of fat get into the vein and travel to the lung.

[5]    Exsanguination is the medical term for when an individual "bleeds out."

The second trial on plaintiffs' wrongful death claim (the trial that is the subject of this appeal) began in January 2020, before Judge James A. Kaddo.  Plaintiffs argued at trial that Vasquez's cause of death on her death certificate was correct:  she bled out.  Defendant argued she died from a microscopic fat embolism unrelated to anything he had done.

**3.**   ***The Evidence***

Because the issue of substantial evidence to support the verdict is at the heart of an appeal from a JNOV, we describe in considerable detail the evidence regarding whether any act or omission of defendant caused Arleen Vasquez's death.

a.     *Plaintiffs' Case*

In support of their exsanguination theory, plaintiffs presented expert testimony from the deputy medical examiner who performed the autopsy (Dr. Ajay Panchal), the anesthesiologist at Vasquez's surgery (Dr. May), a surgery expert (Dr. Lloyd Krieger), and a pathology expert (Dr. Michael Fishbein).

Dr. Panchal testified he found trauma to the right internal iliac artery and 2,200 grams of blood in the abdomen.[6]  Based on these findings, he concluded the decedent died of exsanguination. He testified he did not know with certainty whether defendant's use of the cannula at the entry portal on Vasquez's right thigh or her sacral region caused the traumatic wound to the artery, "[b]ut it appears to be at least one of those two sites, the sacral

---

[6]     Dr. Fishbein estimated that 2,200 cubic centimeters of blood constituted more than half the blood volume of a woman the size of Vasquez.  One cubic centimeter of blood is equivalent to one gram of blood.

5

site or the right thigh; which, more likely would be the sacral site." Dr. Panchal explained that a doctor could access the internal iliac artery without going through the sacral bone by going around it. He testified that he asked the photographer at the medical examiner's office to take a color photo of the trauma to the right internal iliac artery. The photograph was admitted into evidence.

Dr. May, the anesthesiologist at Vasquez's surgery, received permission to attend Vasquez's autopsy.[7] He confirmed Dr. Panchal pointed out to him a laceration "consistent" with the right internal iliac artery underneath a hemotoma (a blood clot) but Dr. May was unsure whether the laceration was to an artery or a vein.

Dr. Fishbein, a forensic pathologist who previously had served as a deputy medical examiner, testified to the cause of death. He concluded Vasquez died of exsanguination based upon the amount of blood found in her abdomen. In the course of his work on the case, Dr. Fishbein met with Dr. Panchal, who presented him with a specimen from Vasquez's case — a piece of tissue that had an artery and a vein running through it. Dr. Fishbein observed a jagged 2-millimeter tear in the artery.

Dr. Fishbein disputed defendant's fat embolus theory, stating that Dr. Panchal's findings were consistent with exsanguination and there was nothing else to explain the death. He reasoned, "The other important thing is, when someone has liposuction or when they have CPR, fat can get into the blood vessels as what we call an incidental finding. So just finding a little fat in the lung wouldn't necessarily make that the cause of

---

[7] Portions of Dr. May's deposition testimony were read into the record.

6

death. Especially here, you have a case where you have a massive blood loss. [¶] So even if there was a little bit of fat in the lung, it wouldn't have been the cause of death, in my opinion."

Dr. Krieger, plaintiffs' surgery expert, testified to the standard of care in 2014 for a Brazilian butt lift. He testified it was mandatory at that time to avoid muscle when harvesting or injecting fat during a Brazilian butt lift. Injecting fat into the muscle created "a much higher risk" that some fat could get into a vessel in the muscle, resulting in a fat embolism, or the cannula was much more likely to go into a pathway that risked injuring critical structures because the cannula was much harder to control when used in muscle rather than fat.

Dr. Krieger confirmed that defendant's operative report indicated he had injected fat into Vasquez's muscle, which was below the standard of care. When asked whether defendant violated the standard of care in any other way, Dr. Krieger concluded that defendant "did not control the position of the tip of the cannula, which is why the iliac artery was pierced; internal iliac." Dr. Krieger further explained, the artery could have been cut in one of three ways—when the infusion fluid was injected or when a cannula was used to pull fat out or put fat in. Dr. Krieger also explained that when defendant's report stated that "care was taken to feather the suctioned areas," that meant in the medical community defendant moved the cannula around that area "going in all directions from the incision, to avoid any of these step-offs." From the term "feather," Dr. Krieger understood defendant moved the cannula up into the abdomen through the right thigh port. Dr. Krieger stated he was of the opinion that a traumatic

7

wound to the right internal iliac artery was a substantial factor in causing Vasquez's death.

Also admitted into evidence was a July 2018 "urgent warning" to surgeons performing Brazilian butt lifts by the Inter-Society Gluteal Fat Grafting Task Force representing three "leading clinical plastic surgery societies" and two scientific societies. The advisory statement was issued "in response to the alarming number of deaths still occurring from the Brazilian Butt Lift (BBL)." The statement noted "[t]he cause of mortality is uniformly fatal fat embolism due to fat entering the venous circulation associated with injury to the gluteal veins. In every patient who has died, at autopsy, fat was seen within the gluteal muscle." As a result, "fat should never be placed in the muscle. Fat should only be placed in the subcutaneous tissues. [Capitalization omitted.]" Because it was easy to enter the muscle unintentionally, the statement warned surgeons to be "aware of the cannula tip at every moment; be vigilant about following the intended trajectory with each stroke and feel the cannula tip through the skin." Dr. Krieger explained the 2018 advisement did not represent a change in the standard of care from 2014, when Vasquez died, but was an "underlining" of urgency.

The owner of the surgery center, Dr. Boris, who also performed Brazilian butt lifts, testified at trial that he initially believed Vasquez died due to a fat embolus, but had changed his mind by the time of the second trial, and believed she died from bleeding out. (Dr. Boris had settled with plaintiffs before the first trial.)

b. *Defendant's Case*

Defendant's theory at trial was that Vasquez died from a microscopic fat embolus that traveled to her lungs. Defendant disputed plaintiffs' theory that he cut into the internal iliac artery, arguing it was anatomically impossible: A cannula could not reach the internal iliac artery from the sacrum port because the sacrum is a large bone that protects the artery and it was undisputed a drill would be needed to pierce the bone. Additionally, a cannula could not reach the internal iliac artery from the right thigh port without leaving a pathway of damage to the internal structures along the way. Defendant noted that Dr. Panchal did not identify any damage to any of the organs or muscles between the thigh port and the internal iliac artery. Defendant also disputed Dr. Panchal's observation that Vasquez's abdomen was full of blood. He posited the fluid in the abdomen was mostly comprised of the fluids administered at the hospital.

Defendant testified in his own defense and described the procedure he used in Vasquez's surgery. He also testified that it was common practice in 2014 for the plastic surgeons he knew to inject fat into muscle, and that the standard of care changed only in 2018 when the advisory was issued. Defendant stated it would have been impossible for a blunt object like a cannula to reach and pierce the internal iliac artery through the thigh or sacrum port. He believed Dr. Panchal misidentified the internal iliac artery; he believed it was "either nothing, . . . or a vein." Defendant, however, admitted a patient could bleed out from a vein. He also acknowledged he could penetrate the muscle using a cannula if he changed the angle and pushed "so hard."

Defendant's forensic pathologist, Dr. Kevin Whaley, testified it was impossible for the cannula to breach the sacral

9

bone.  Dr. Whaley testified access to the internal iliac artery through the right thigh port would require the cannula to breach the peritoneum as well as go through several organs such as the intestine and the uterus.[8]  He explained there was no notation in the autopsy report that any of those structures or organs were damaged and therefore no pathway of damage was seen by Dr. Panchal, the deputy medical examiner.  Dr. Whaley also emphasized that Dr. Panchal's testimony from the first trial (when he testified the injury to the internal iliac artery likely came through the thigh port) differed from the second trial (when he testified it likely came through the sacrum).

Dr. Whaley explained Vasquez's vital signs were indicative of a fat embolism because her oxygen levels dropped suddenly rather than slowly, as they would from a bleed out.  He explained a precipitous drop in oxygen and carbon dioxide levels with slowed heart rate were the three important markers for fat embolism.  Dr. Whaley questioned whether the fluid found in Vasquez's abdomen was all blood.  He posited that it mostly contained a large amount of the fluid that was administered during the emergency treatment.  He testified Vasquez's abdomen would have been tense and distended if it had been full of blood when she arrived at the emergency room but that the emergency room doctor palpated or pressed against her abdomen and observed it was soft.

Dr. Mark Mofid, a plastic surgeon, testified about the standard of care in 2014 for Brazilian butt lift surgery.  Dr. Mofid

---

[8]      Dr. Fishbein explained the peritoneum was "sort of like a layer of saran wrap that surrounds your body cavity" and "if fluid accumulates or something gets in there, it can fill up.  So anything in that saran wrap layer is called peritoneal."

authored a 2017 article bringing to light the risks associated with injecting fat into muscle rather than into subcutaneous fat. In support of his article, he conducted a nationwide survey of plastic surgeons. He affirmed that prior to 2018, 90 to 100 percent of plastic surgeons would have made intramuscular injections in a Brazilian butt lift and that "it's absolutely absurd" to assert the standard of care was otherwise in 2014.

## 4.    *JNOV*

The jury entered a verdict for plaintiffs, finding defendant was negligent in his treatment of Vasquez and that his negligence was a substantial factor in causing her death. The jury found plaintiffs suffered past economic loss of $231,292, future economic loss of $784,942, and future nonecomonic loss of $3 million.[9]

Defendant moved for JNOV on the ground there was no substantial evidence to support the verdict. In the alternative, he moved for new trial on the grounds of insufficient evidence, excessive damages, and attorney misconduct. By order dated July 1, 2020, the trial court rejected defendant's contention that there was insufficient evidence to support a finding of negligent conduct, but granted partial JNOV on the issue of causation. It explained plaintiffs presented insufficient evidence "illuminating the connection between the decedent's purported exsanguination and the intramuscular fat injection made by the cannula." The

---

[9]    The trial court reduced the award of noneconomic damages from $3 million to $250,000 pursuant to former Civil Code section 3333.2, subdivision (b), which placed a $250,000 cap on awards for noneconomic damages in all medical malpractice litigation. (*Yates v. Pollock* (1987) 194 Cal.App.3d 195, 200.) The trial court additionally deducted plaintiffs' settlement with Dr. Boris pursuant to Code of Civil Procedure section 877.6.

11

court faulted Dr. Panchal for not testifying "that the intramuscular injection was the cause-in-fact of the nicking of the internal right iliac artery."

The trial court similarly found fault with the remaining plaintiffs' experts' testimony. As to Dr. Krieger (plaintiffs' surgery expert), the court found lacking his testimony that defendant "did not control the position of the tip of the cannula, which is why the iliac artery was pierced" and that the trauma to the artery was a substantial factor in causing Vasquez's death. According to the court, "this does not assist the jury in determining whether the use of the intramuscular injection was a cause in fact of the injury."

The court also disregarded Dr. Fishbein's (plaintiffs' pathologist) testimony that Vasquez died from bleeding out based on the amount of blood found in her abdomen and that there was no other explanation for her death. Again, the court concluded Dr. Fishbein's testimony failed to include additional evidence that it was more likely than not that the intramuscular injection with the cannula was a cause-in-fact of the purported exsanguination. The court concluded "none of [p]laintiffs' experts' testimony on causation contained a reasoned explanation connecting the exsanguination to the intramuscular fat injection . . . nor could they testify to such to a reasonable medical probability." As a result, the court found plaintiffs' expert testimony "did not assist the jury in determining whether it was more probable than not that the cannula intramuscular injection of fat traumatized the right internal iliac artery and caused the decedent to bleed out." The court then found that Vasquez's vitals precluded plaintiffs' bleed-out theory.

12

Given its ruling on the JNOV motion, the trial court initially concluded defendant's new trial motion was moot. It nevertheless addressed in detail the grounds for granting a new trial motion. It noted that had the JNOV not been granted, the motion for new trial would have been. On July 8, 2020, the trial court entered an amended order granting defendant's motion for new trial in the alternative on the same grounds as set out in the July 1, 2020 order. The court entered judgment in favor of defendant on July 29, 2020. Plaintiffs timely appealed. The Notice of Appeal stated the appeal was from the judgment and the July 1, 2020 and July 8, 2020 orders. (Code Civ. Proc., § 04.1)

On August 12, 2020, defendant filed his memorandum of costs, seeking, among other costs, court reporter fees. Plaintiffs moved to tax costs, particularly the reporter fees. The trial court denied plaintiffs' motion "on legal and practical grounds." It reasoned, "There is case law to support an award of the costs submitted by defendant. As to the court reporter fees, the court reporter is beneficial to creating a record which would be impossible without that aid, and therefore motion to strike court reporter fees is denied on practical grounds." Plaintiffs filed a notice of appeal from the costs order. We consolidated the appeals.[10]

## DISCUSSION

Plaintiffs contend the trial court ignored the substantial evidence supporting the jury's verdict and erroneously granted

---

[10] Defendant filed a protective cross-appeal but indicated during briefing that he would not pursue it.

13

JNOV.[11] We agree that substantial evidence supports the verdict and reverse the JNOV. In light of our reversal, the award of costs to defendant must also be reversed since he is no longer a prevailing party as identified under Code of Civil Procedure section 1032, subdivision (a)(4).[12] Reversal of the JNOV does not

---

[11] Defendant asserts plaintiffs have forfeited their challenge to the JNOV because they failed to include the JNOV motion, opposition, and reply briefs in the record on appeal. We decline to find forfeiture on this basis. On an appeal from JNOV, we use the same standard the trial court used in ruling on the motion — whether substantial evidence supports the jury's verdict. (*Pacific Corporate Group Holdings, LLC v. Keck* (2014) 232 Cal.App.4th 294, 309 (*Keck*).) Here, the record contains the entire reporter's transcript for the second trial and relevant admitted trial exhibits. The trial court's order granting JNOV also extensively describes the parties' arguments and evidence. Although the failure to include the underlying memoranda of points and authorities is puzzling, plaintiffs have provided an adequate record for a meaningful review of the claimed errors. (See *Jameson v. Desta* (2018) 5 Cal.5th 594, 609 [discussing adequacy of record and importance of reporter's transcript on appeal].)

[12] In a footnote, plaintiffs assert a number of additional errors that they claim were mooted by the JNOV order, including that the court erred when it offset the jury's damages award with their settlement with Dr. Boris. Plaintiffs fail to properly address these assertions of error in their briefs. For the purposes of this appeal, we treat them as abandoned. (See *Holden v. City of San Diego* (2019) 43 Cal.App.5th 404, 419.) While plaintiffs purport to "reserve the right" to submit a brief on these issues to this Court in the event we reverse the JNOV, we decline to accept any supplemental briefs. (Cal. Rules of Court, rule 8.200 ["No other brief may be filed except with the permission of the

14

mean reinstatement of the jury's verdict, however. The trial court in the alternative also granted defendant's motion for a new trial. Plaintiffs have failed to meet their burden to demonstrate the trial court committed reversible error when it granted defendant's new trial motion. We therefore remand the matter for a new trial and related proceedings.

1. ***JNOV***

   a. *Standard of Review*

   "A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support." (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.) Our review is the same; we determine if substantial evidence supported the jury's verdict. (*Keck, supra*, 232 Cal.App.4th at p. 309.) "If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 874 (original emphasis omitted); see *Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1245.)

   b. *Proof of Causation in Wrongful Death Claims*

   " 'The law is well settled that in a personal injury action causation must be proven within a reasonable medical probability based upon competent expert testimony.' " (*Miranda v. Bomel Construction Co., Inc.* (2010) 187 Cal.App.4th 1326, 1336; see also *Bromme v. Pavitt* (1992) 5 Cal.App.4th 1487, 1499.) Causation may be shown by reasonable inferences drawn from substantial evidence. (*Sarti v. Salt Creek Ltd.* (2008)

---

presiding justice . . . ."].) On remand, the trial court may address additional issues encompassed in our remand.

15

167 Cal.App.4th 1187, 1196; *Espinosa v. Little Co. of Mary Hospital* (1995) 31 Cal.App.4th 1304, 1315.)

A plaintiff must prove that a defendant's negligence was a substantial factor in causing her harm. (*Bockrath v. Aldrich Chemical Co.* (1999) 21 Cal.4th 71, 79.) " 'The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical.' [Citation.] Thus, 'a force which plays only an "infinitesimal" or "theoretical" part in bringing about injury, damage, or loss is not a substantial factor' [citation], but a very minor force that does cause harm is a substantial factor [citation]. This rule honors the principle of comparative fault." (*Ibid.*)

The plaintiff's expert "need not exclude all other possibilities before he or she can express an opinion that defendant's conduct or product caused the plaintiff's harm." (*Cooper v. Takeda Pharmaceuticals American, Inc.* (2015) 239 Cal.App.4th 555, 580.) Rather, "the plaintiff must offer an expert opinion that contains a reasoned explanation illuminating why the facts have convinced the expert, and therefore should convince the jury, that it is *more probable than not* the negligent act was a cause-in-fact of the plaintiff's injury." (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1118 (*Jennings*).)

In *Jennings*, a case on which defendant relies, the trial court struck the testimony of the plaintiff's expert medical witness because the expert failed to provide a reasonable explanation linking the plaintiff's injury to the defendants' negligence. (*Jennings, supra,* 114 Cal.App.4th at pp. 1119–1121.) There, the defendants left a ribbon retractor inside the plaintiff's

16

peritoneal cavity after surgery. During the second surgery to remove the retractor, the defendants observed an abdominal infection in subcutaneous tissue outside the peritoneal wall. The subcutaneous infection was separated from the peritoneal cavity (where the retractor was located) by the peritoneal wall and some muscles; there were no clinical symptoms suggesting the retractor caused any infection within the peritoneal cavity. (*Ibid.*)

The Court of Appeal found no error in the trial court's order striking the expert's testimony, concluding that the plaintiff's expert "never articulated why or how it was more likely than not that the bacteria, after multiplying without any clinical symptoms that ordinarily accompany peritonitis, migrated from the nidus within the peritoneal cavity through the sutured peritoneal wall, the transversalis fascia, the muscle group and the rectus fascia, finally settling into the subcutaneous tissue, while leaving the peritoneal wall intact and leaving behind no trail of inflamed or infected tissue evidencing this migration. Instead, [the expert] substituted a conclusion in place of an explanation, opining '[i]t just sort of makes sense. We have that ribbon retractor and [it's] contaminated, he's infected.' That opinion is too conclusory to support a jury verdict on causation." (*Jennings, supra,* 114 Cal.App.4th at p. 1120, fn. omitted.)

c. *Substantial Evidence Supported the Jury's Verdict*

The jury in this case could have reasonably inferred from substantial evidence that either defendant's injection of fat into muscle or his lack of control of the cannula was a substantial cause of the wound to the right internal iliac artery, which resulted in Vasquez's death by exsanguination.

17

Plaintiffs' theory at trial was that defendant breached the standard of care in two ways: (1) he injected fat into the gluteal muscle resulting in a loss of control of the cannula; and (2) he simply did not control the position of the tip of the cannula when he was harvesting fat or injecting fluid through the right thigh port. Plaintiffs then linked defendant's negligence to the wound to Vasquez's right internal iliac artery, which resulted in exsanguination and her death.

As to the breach in the standard of care, Dr. Krieger testified as follows:

"Q And the standard of care suggested strongly not to inject fat into muscle tissue; correct?

"A Correct.

"Q Now, can you describe for the jury all of the ways, if there are any others, you believe Dr. Hughes violated -- [¶] or can you tell the jury in what manner you believe, based on your education, training, experience, and the like, Dr. Hughes did or did not do to violate the standard of care.

"A Well, he -- he did not control the position of the tip of the cannula, which is why the iliac artery was pierced; internal iliac.

"Q And that clearly was below the standard of care; correct, sir?

"A Correct."

The court, in its JNOV ruling, only addressed whether defendant was negligent by injecting fat into muscle. The record, however, discloses the plaintiffs' theory of negligence was not limited to injection of fat into muscle. Defendant acknowledges Dr. Krieger believed the standard of care was breached in two ways: "Dr. Krieger also opined that it was negligent for Dr.

18

Hughes to 'feather' around the inner thigh access ports. He opined that Dr. Hughes did not control the position of the tip of the cannula, which is why the iliac artery was injured."

Dr. Krieger then testified the injury to the artery occurred either "when Dr. Hughes lost control of the tip of cannula when he was using the cannula either though the groin or through the top of the buttocks." According to Dr. Krieger, defendant "did not control the position of the tip of the cannula, which is why the iliac artery was pierced; internal iliac" and that the cannula "was pushed too deep and cut the iliac artery, resulting in what's called exsanguination, which is where their blood pools outside of the blood vessels."[13]

Dr. Krieger also testified defendant lost control of the cannula when he injected fat into Vasquez's buttock muscle because the cannula had to penetrate several layers of protective tissue. The cannula would be "much more likely to go into a pathway that is of high risk for injuring critical structures" because the muscle contained blood vessels. Dr. Krieger explained, muscle "is much tougher than fat. Fat is fluffy. Muscle is strong, like in the gym. So to get into the muscle, you've got to push. So you're at a bad angle [not parallel to the skin], that's in an unsafe space, at an unsafe angle, and you're forced to push harder. [¶] And just as I only want to go six inches, oops, I went six and a half. And that's very, very hard to control when you are in the muscle rather than staying parallel, in the fat layer."

When asked how defendant could have reached the right internal iliac artery from the back port, both Dr. Panchal and Dr.

---

[13] This testimony was cited by the trial court in denying defendant's earlier motion for nonsuit on causation.

19

Krieger responded he could do so without having to drill through the sacrum bone.

Dr. Krieger testified that the term "feather" was understood by the medical community to mean using the cannula in all directions to ensure even removal of fat. Thus, defendant's note that "[c]are was taken to feather the suctioned areas" meant he used the cannula in the direction of the abdomen from the thigh port even though he did not harvest fat from the abdomen. Dr. Krieger also explained the cannula could reach the internal iliac artery through the right thigh port without damaging internal organs or other structures along the way: "Well, what happens is that when someone is under anesthesia, their muscles are all relaxed. And so they're actually often paralyzed. And so that allows the structures that are inside to be what we call flaccid, to lie loosely. [¶] And so while there are plenty of other structures in the abdomen, there was a clear path that could have avoided those structures to get to the internal iliac artery. [¶] And I think you can really see that in this model, that you can go from here and get it." Dr. Fishbein likewise testified there were organs in the area that could "be pushed aside . . . ."

Having presented testimony on how the right internal iliac artery was pierced, plaintiffs established through expert testimony that Vasquez's death was caused by exsanguination resulting from the wound to the artery. Dr. Panchal weighed the amount of blood found in Vasquez's body and Dr. Fishbein testified that 2,200 grams or CC's of blood constituted more than half the volume of blood for a woman the size of Vasquez.[14] Dr.

---

[14] The jury was free to not credit contrary testimony from Dr. Whaley, defendant's expert, that the 2,200 grams included significant amounts of nonblood fluid.

Panchal and Dr. Krieger affirmed to a medical certainty that Vasquez died from exsanguination caused by a traumatic wound to the right internal iliac artery.

From this substantial evidence, the jury could reasonably have inferred that defendant's deviation from the standard of care—either by losing control of the tip of the cannula during liposuction or during injection of fat into the muscle—caused Vasquez's death.

While no expert testified word by word that the injury to the right internal iliac artery resulted from defendant's injection of fat into muscle from the sacrum port or loss of control during the harvesting of fat through the thigh port, plaintiffs' witnesses affirmed the artery was lacerated. We are persuaded that plaintiffs were not required to pin down the exact mechanism by which these two acts contributed to Vasquez's death. Plaintiffs' experts offered a reasoned explanation why it was more probable than not one of defendant's negligent acts was a cause-in-fact of Vasquez's death. (*Jennings, supra,* 114 Cal.App.4th at p. 1118.)

The expert testimony in this case differs from the *Jennings* expert's conclusion that " '[i]t just sort of makes sense,' " while at the same time providing no explanation as to how the infection could have spread from a surgical device left inside the peritoneal wall to outside the sutured peritoneal wall, then through various internal structures and muscles while leaving no trace of infected tissue. (*Jennings, supra,* 114 Cal.App.4th at p. 1120.)

We are also not persuaded by defendant's multiple attempts to reweigh and reargue the evidence. In particular, defendant faults Dr. Krieger for not knowing the precise length of the cannula, for contradicting defendant's testimony that he never directed the cannula "upward" into the abdomen from the

21

groin crease, and for testifying defendant lost control of the cannula when he did not testify to any loss of control.[15] Defendant further asserts Dr. Panchal's autopsy was deficient because he did not perform an analysis of the fluid found in Vasquez's abdomen, examine Vasquez's lungs with a microscope, or consider Vasquez's vital signs before determining a cause of death. Nor was there "undisputed evidence," as defendant's claims, of a fat embolism as the cause of death. "When reviewing an order granting a judgment notwithstanding the verdict our

---

[15] Defendant characterizes Dr. Krieger's testimony as "conjecture" from this exchange:
"Q Okay. So he didn't go into the abdomen?
"A Well, clearly he cut the artery.
"[¶] . . . [¶]
"Q Okay? Did he say – strike that. [¶] . . . [¶] Do you know of any actual evidence that he went up, ever?
"A Well, the evidence is the lacerated artery, I guess."
From this isolated testimony, defendant asserts Dr. Krieger offered no other evidence or explanation beyond his "guess" that defendant's cannula went "up" into the abdomen. Yet, Dr. Krieger's immediately preceding testimony was:
"Q When did he say he went up, sir?
"A When he said that he feathered.
"Q So the word – [¶] . . . [¶]--'feathered,' to you, means to go up; is that right?
"A The word 'feathered' means that you go -- not to me. The use of the term, universally, is that you're going in all directions from the incision, to avoid any of these step-offs.
"Q Okay. That's your understanding of the word 'feathered.'
"A Incorrect. That is the universal usage of the term within the medical community."
Taken in context, Dr. Krieger's testimony regarding the injury from the thigh port was more than a "guess."

role is not to weigh the evidence, but rather to determine whether any substantial evidence supported the jury verdict." (*Begnal v. Canfield & Associates, Inc*. (2000) 78 Cal.App.4th 66, 77–78.) We have described the evidence supporting the jury's verdict and conclude the trial court erred in granting the JNOV.

## 2. *New Trial Order*

The trial court alternatively granted defendant's new trial motion on two grounds: it found plaintiffs presented insufficient evidence of causation and plaintiffs' attorney committed misconduct in his rebuttal argument. On appeal, plaintiffs challenge only the finding that their trial counsel committed misconduct, but fail to properly cite to the record or pertinent legal authorities to support their argument.

Plaintiffs entirely fail to address whether it was error for the trial court to grant a new trial on the issue of causation. By their silence, plaintiffs apparently have assumed that JNOV and new trial orders are subject to the same standard of review on appeal. Not so. As our Supreme Court has explained in *Lane v. Hughes Aircraft Co*. (2000) 22 Cal.4th 405, we apply different standards of review in considering the JNOV ruling and the new trial order. In *Lane*, as here, the trial court granted JNOV and, alternatively, a motion for new trial based on insufficiency of the evidence. The new trial order cross-referenced findings the trial court made in granting the JNOV. (*Id*. at p. 413.) The appellate court reversed the JNOV, finding substantial evidence supported the verdict. The appellate court then determined it did not need to consider whether the evidentiary record supported the new trial order since it had analyzed whether sufficient evidence supported the verdicts with respect to the JNOV. (*Id*. at p. 411.) Our high court held the appellate court erred in applying the

23

same standard when reviewing the JNOV and new trial order. (*Id*. at pp. 415–416.)

The *Lane* court explained, "an order granting a new trial under [Code of Civil Procedure] section 657 'must be sustained on appeal unless the opposing party demonstrates that no reasonable finder of fact could have found for the movant on [the trial court's] theory.' [Citation.] Moreover, '[a]n abuse of discretion cannot be found in cases in which the evidence is in conflict and a verdict for the moving party could have been reached . . . .' [Citation.] In other words, 'the presumption of correctness normally accorded on appeal to the jury's verdict is replaced by a presumption in favor of the [new trial] order.' " (*Lane, supra*, 22 Cal.4th at p. 412.)

Given this authority, plaintiffs are not free to argue, essentially, "There was substantial evidence to defeat a JNOV; it follows there was substantial evidence to defeat the grant of a new trial." Unlike a court considering a JNOV motion, the court ruling on a new trial motion sits in an entirely different chair. "The powers of a trial court in ruling on a motion for new trial are plenary. The California Supreme Court has held that the trial court, in ruling on a motion for new trial, has the power 'to disbelieve witnesses, reweigh the evidence, and draw reasonable inferences therefrom contrary to those of the trier of fact' [citation], that the court sits as 'an independent trier of fact' [citation] and that it must 'independently assess[] the evidence supporting the verdict'. " (*Barrese v. Murray* (2011) 198 Cal.App.4th 494, 503.)

We need not review the evidence justifying the trial court's decision, sitting as the "13th juror," to order a new trial because plaintiffs do not challenge the new trial ruling on appeal. "[I]t is

a fundamental principle of appellate procedure that a trial court judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment." (*Jameson v. Desta, supra,* 5 Cal.5th at pp. 608–609.) We accordingly affirm the new trial order and remand the matter for a new trial and other proceedings consistent with our opinion.

## *DISPOSITION*

The July 1, 2020 order granting partial judgment notwithstanding the verdict as to the issue of causation is reversed.  The September 17, 2020 order denying plaintiffs' motion to tax costs is reversed.  The July 8, 2020 order granting the new trial motion is affirmed.  The matter is remanded for a new trial and other proceedings consistent with our opinion.  The parties to bear their own costs on appeal.

RUBIN, P. J.

WE CONCUR:

BAKER, J.

MOOR, J.